Paul Whitmore     G-40654
(Name)

P.O. Box 3471
(Address)

Corcoran, CA   93212-3471
(City, State, Zip)

G-40654
(CDC Inmate No.)

FILED

DEC 12 2014

CLERK US DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY                              DEPUTY

2254        1983
FILING FEE PAID
Yes          No
IFP MOTION FILED
Yes          No
COPIES SENT TO
Court      Pro Se

# United States District Court
## Southern District of California

PAUL GORDON WHITMORE,                )
(Enter full name of plaintiff in this action.)       )
                                     )
                         Plaintiff,  )
                                     )
    v.                               )
                                     )
JEFFERY DORT, ASST. DIST. ATTORNEY   )
STEPHANIE GUERRA, S.D. Sheriff DET.  )
PAUL PFINGST, DISTRICT ATTORNEY,     )
BONNIE DUMANIS, DISTRICT ATTORNEY,   )
(Enter full name of each defendant in this action.)  )
JOHN DOES 1 THROUGH 5    Defendant(s).  )
                                     )

Civil Case No. 14CV2949 DMS BGS
(To be supplied by Court Clerk)

Complaint Under the
Civil Rights Act
42 U.S.C. § 1983

## A. Jurisdiction

Jurisdiction is invoked pursuant to 28 U.S.C. § 1343(a)(3) and 42 U.S.C. § 1983. If you wish to assert jurisdiction under different or additional authority, list them below.

## B. Parties

1. Plaintiff: This complaint alleges that the civil rights of Plaintiff, Paul Gordon Whitmore,
(print Plaintiff's name)
, who presently resides at P.O. Box 3471, Corcoran,
(mailing address or place of confinement)
California, 93212-3471
, were violated by the actions
of the below named individuals. The actions were directed against Plaintiff at San Diego County
(institution/place where violation occurred)
on (dates) December 2001 through March 2006
(Count 1)     (Count 2)     (Count 3)

2. Defendants: (Attach same information on additional pages if you are naming more than 4 defendants.)

§ 1983 SD Form
(Rev. 5/98)

::ODMA\PCDOCS\WORDPERFECT\22834\1

I. Defendant  Jeffery DORT                    resides in  San Diego County                    ,
                    (name)                                                (County of residence)
and is employed as a  Asst. District Attorney, SD County . This defendant is sued in
                              (defendant's position/title (if any))
his/her XX individual XX official capacity.  (Check one or both.)  Explain how this defendant was acting

under color of law:  Jeffery DORT was the prosecuting attorney in the criminal case

against plaintiff, beginning before Plaintiff's arrest in Jan 2002. He was

involved in the investigation, evidence collection, and was responsible for all

actions of the other defendants under his authority.

II. Defendant  Stephanie GUERRA              resides in  San Diego County                    ,
                    (name)                                                (County of residence)
and is employed as a  S.D. Sherrif Detective        . This defendant is sued in
                              (defendant's position/title (if any))
his/her XX individual XX official capacity.  (Check one or both.)  Explain how this defendant was acting

under color of law: Stephanie GUERRA was the lead investigator under DORT. She was

responsible for all investigations. She had direct and frequent contact with the

other investigators, as well as the Danish Police.


III. Defendant  Paul PFINGST                   resides in  San Diego County                  ,
                    (name)                                                (County of residence)
and is employed as a  District Attorney (Elected) . This defendant is sued in
                              (defendant's position/title (if any))
his/her XX individual XX official capacity.  (Check one or both.)  Explain how this defendant was acting

under color of law: PFINGST was the elected offical over the DA's office during

the early months of the arrest, and during the time where the Danish evidence

still existed, and was destroyed.


IV. Defendant  Bonnie DUMANIS                 resides in  San Diego County                   ,
                    (name)                                                (County of residence)
and is employed as a  District Attorney, (Elected) . This defendant is sued in
                              (defendant's position/title (if any))
his/her XX individual XX official capacity.  (Check one or both.)  Explain how this defendant was acting

under color of law:  DUMANIS was elected to PHINGST's position as DA beginning

in 2003. She was, and still is, DA of SD County. She had direct supervisory

oversight of DORT during the period of the investigation and trial.


V Defendant    John DOES 1 to 5      are individuals unknown to Plaintiff, who

worked for SD County   during November 2001 through June 2002 and later,

, and who had initial contact with the Danish national Police and

Interpol. They accepted the evidence used against Plaintiff at trial, from

the Danish police. They are sued in their individual and offical capacity.

**C. Causes of Action** (You may attach additional pages alleging other causes of action and the facts supporting them if necessary.)

<u>Count 1</u>: The following civil right has been violated: Due Process, access to impeachment evidence denied when Danish destroyed evidence (E.g., right to medical care, access to courts, due process, free speech, freedom of religion, freedom of association, freedom from cruel and unusual punishment, etc.)

<u>Supporting Facts</u>: [Include all facts you consider important to Count 1. State what happened clearly and in your own words. You need not cite legal authority or argument. Be certain to describe exactly what each defendant, *by name*, did to violate the right alleged in Count 1.]

The source of almost all evidence used to convict Plaintiff was obtained from a computer seized in Denmark, owned by Eggert Jensen. U.S. Customs officers were contacted as early as December 2001. San Diego officers had the evidence CD as early as January15, 2002. At no time did anyone move to secure the Danish computer for evaluation or examination by the defense. At trial, the Danish police testified that they had destroyed the computer and more than half of the documents and reports generated in the case by the Danish. Defense team had made numerous requests for discovery, all to no avail.

DORT was ultimately responsible for the entire prosecution team and never made any effort to secure the computer. He even quiped that, 'this case didn't start in Denmark, it started in Clovis [with codefendant's arrest].' He resisted all efforts to get the required evidence for the defense team.

GUERRA was a senior detective with the SD Sherrif's Office, and assigned to the Internet Crimes Against Children (ICAC) International Task Force. She was in Denmark on at least two occasions as part of the investigation before the computer was destroyed. She never tried to secure it, stating she 'didn't think it was necessary.'

PFINGST was the DA at the time of the initial evidence collection and Plaintiff's arrest. PFINGST has close supervision of DORT, due to it being such a high profile case. He never directed anyone to secure the computer.

DUMANIS was the DA during the majority of the case and trial. She never made any effort to collect any evidence, find other sources for the defense, and would not offer a reasonable plea bargain to compensate for the mishandled and destroyed evidence.

DOES 1-5 were U.S. Officers in SD County Sheriff's Dept, they initially took custody of evidence. They never moved to secure the computer in Denmark for the defense team's inspection.


Please see attached case narrative for further information.

Count 2:  The following civil right has been violated: Due Process, denied evidence of

(E.g., right to medical care, access to courts,

mitigating factors  by destruction of computer and other documents by Danish
due process, free speech, freedom of religion, freedom of association, freedom from cruel and unusual punishment, etc.)

Supporting Facts:    [Include all facts you consider important to Count 2.  State what happened clearly and in your own words.  You need not cite legal authority or argument.  Be certain to describe exactly what each defendant, *by name*, did to violate the right alleged in Count 2.]

At trial, evidence of blackmail was mentioned several times. Had evidence
of the Plaintiff being blackmailed come forth, a much lower sentence than
the 467 years to life Plaintiff was given could have been given.
Individual actions are the same as in the previous Count 1.


Please see attachend case narrative for further information.


Count 3:  The following civil right has been violated: Due Process, denied evidence of third

(E.g., right to medical care, access to courts,

party culpability when evidence was destroyed

due process, free speech, freedom of religion, freedom of association, freedom from cruel and unusual punishment, etc.)

<u>Supporting Facts:</u>   [Include all facts you consider important to Count 3.  State what happened clearly and in your own words.  You need not cite legal authority or argument.  Be certain to describe exactly what each defendant, *by name*, did to violate the right alleged in Count 3.]

The identity of the 'victim's was contested at trial. Almost none of the victim-witnesses could describe molest events, and all but two denied being molested by Plaintiff. Once they were shown photographs (digital images printed out) of molests, then they identified themselves. However, they usually couldnot identify the perpatrator, the 'hairy hand' in the photo. When the computer and interviews (and other reports) were destroyed, it eliminated the defense from finding proof that the pictures were manefactured, i.e. that somebody else was molested and the 'victim's head put on digitally.

Actions of the individual DEFENDANTS remains the same as in Count 1.

Please see attached case narrative for further information.

## D.  Previous Lawsuits and Administrative Relief

1.  Have you filed other lawsuits in state or federal courts dealing with the same or similar facts involved in this case? ☒Yes ☐ No.

If your answer is "Yes", describe each suit in the space below. [If more than one, attach additional pages providing the same information as below.]

(a) Parties to the previous lawsuit:

~~Plaintiffs~~ Appellant/Petitioner: Paul Whitmore

~~Defendants~~ Respondent: Matthew Cate, Sec of CDCR

(b) Name of the court and docket number: Dist Court Southern CA, 09 CV 1324 MMA MDD

(c) Disposition: [ For example, was the case dismissed, appealed, or still pending?] Dismissed with prejudice

(d) Issues raised: Confrontation Error, Insufficent Foundation, Chain of Custody Violated, several grounds of Insufficent Evidence

(e) Approximate date case was filed: 2009

(f) Approximate date of disposition: 6/12/2012

2. Have you previously sought and exhausted all forms of informal or formal relief from the proper administrative officials regarding the acts alleged in Part C above? [E.g., CDC Inmate/Parolee Appeal Form 602, etc.] ? ☐ Yes ☒ No.

If your answer is "Yes", briefly describe how relief was sought and the results. If your answer is "No", briefly explain why administrative relief was not sought.

Relief was sought under criminal litigation, including direct appeal and habeas application. There is no method of administrative relief that Plaintiff is aware of for such criminal court violations.

**E. Request for Relief**

Plaintiff requests that this Court grant the following relief:

      1.  An injunction preventing defendant(s):

      2.  Damages in the sum of $ **500,000**

      3.  Punitive damages in the sum of $ **4,500,000**

      4.  Other:

**F. Demand for Jury Trial**

Plaintiff demands a trial by ☒ Jury ☐ Court.  (Choose one.)

**G.  Consent to Magistrate Judge Jurisdiction**

In order to insure the just, speedy and inexpensive determination of Section 1983 Prisoner cases filed in this district, the Court has adopted a case assignment involving direct assignment of these cases to magistrate judges to conduct all proceedings including jury or bench trial and the entry of final judgment on consent of all the parties under 28 U.S.C. § 636(c), thus waiving the right to proceed before a district judge.  The parties are free to withhold consent without adverse substantive consequences.

The Court encourages parties to utilize this efficient and expeditious program for case resolution due to the trial judge quality of the magistrate judges and to maximize access to the court system in a district where the criminal case loads severely limits the availability of the district judges for trial of civil cases.  Consent to a magistrate judge will likely result in an earlier trial date. If you request that a district judge be designated to decide dispositive motions and try your case, a magistrate judge will nevertheless hear and decide all non-dispositive motions and will hear and issue a recommendation to the district judge as to all dispositive motions.

You may consent to have a magistrate judge conduct any and all further proceedings in this case, including trial, and the entry of final judgment by indicating your consent below.

Choose only one of the following:

☐ Plaintiff consents to magistrate judge jurisdiction as set forth above.

**OR**

☒ Plaintiff requests that a district judge be designated to decide dispositive matters and trial in this case.

I declare under the penalty of perjury that the foregoing is true and correct.

12/9/2014
Date

_____
Signature of Plaintiff

Paul Whitmore
G-40654
CSP-Corcoran
P.O. Box 3471
Corcoran, CA  93212-3471

In Pro Se


IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA



PAUL GORDON WHITMORE,                    )  Case No.: _____
                                         )
            Plaintiff,                    )  **CASE NARRATIVE;**
                                         )  **ATTACHMENT TO COMPLAINT APPLICATION**
        v.,                              )  **FORM 1983 SD FORM**
                                         )
JEFFERY DORT, S.D. ABA, et al.,          )
                                         )
            Defendants.                   )
                                         )
_____)


Paul Whitmore
G-40654

CSP-Corcoran
P.O. Box 3471
Corcoran, CA  93212-3471

In Pro Se


- i -

1

<u>INDEX TO CITATIONS AND EXHIBITS</u>

2

CITATIONS

3   Arizona v Youngblood (1988) 488 U.S. 51                                    4

4   Brady v Maryland (1963) 373 U.S. 83, 83 S.Ct. 1194                         3

5   California v Trombetta (1984) 467 U.S. 479                                 5

6   Daniels v Williams (1986) 474 U.S. 322, 328, 106 S.Ct. 622               11

7   Davidson v Cannon (1986) 474 U.S. 344, 349, 105 S.Ct. 688               11

8   Faulkner v County of Kern 2006 U.S. Dist Lexis 44151                    4, 5

9   Heck v Humphrey (1994) 512 U.S. 477, 114 S.Ct. 2364                       4

10  James v Rowlands (CA9 2009) 606 F.3d 646                                 11

11  People v Kongs (1994) 30 Cal.App.4th 1941                                8

12  Skinner v Switzer (2011) 562 U.S. _____, 131 S.Ct. 1289                   5

13  Smith v Shortt 2008 U.S. Dist. Lexis 96267                              11

14  U.S. v Brown (CA5 2011) 650 F.3d 581                                    11

15  U.S. v Doe (CA9 2011) 705 F.3d 1134                                     11

16  Wilkerson v Dotson (2005) 544 U.S. 74, 125 S.Ct. 1242                     4

17

18  California Evidence Code 1552 et seq.                                     9

19

20

21

22

23

24

25

26

27

28                                    - ii -

```
 1                              EXHIBITS

 2    A   RT 658-9          Pallenson, 10/25/05, Danish evidence destroyed    8

 3    B   RT 870            Underbjerg, 10/27/05, Meetings and phone calls    6

 4        RT 878-9          Underbjerg, same, Numerous calls w/ GUERRA

 5        RT 955-6          GUERRA, 10/28/05, GUERRA contacts w/ Underbjerg

 6        RT2405            Johnson, 11/10/05, Conference w/ EU officers in US

 7        RT 3054           GUERRA, 11/17/05, Frequent contacts w/ Danish police

 8    C                     Denial for certiorari by SCOTUS                   5

 9    D   CT 373            DORT's name on arrest warrent affidavit           5

10    E   RT 950-1          GUERRA, 10/28/05, lead investigator               8

11    F   CT 677-680        People's opposition to suppression, no evidence   8

12    G   RT 439            Menz, 10/24/05, no evidence of fake photos        8

13        RT 470            Menz, no evidence

14    H   RT 1117           Underbjerg, 11/01/05, explains "99.9999%"         8

15        RT 2451           Johnson, 11/10/05, evidence is "value judgement"

16    I   RT 448-9          Menz, "multiple modes of failure in computers"    9

17    J   RT 1229-30        Cassida, 11/02/05, Emmerson "extreme packrat"     9

18    K   CT 621-6          DORT, People's in limine, hacking defense SODDI  10

19    L   RT 1118-21        Court, 11/01/05, Denies '3rd party' defense       5

20    M   RT 552            Pallenson, 10/25/05, 88 'chatters' on Jensen computer  10

21    N   RT 618            Pallenson, 'Morphing' pics on Jensen computer     9

22        RT 2356           Johnson, sames, 'Morphing' pics on Plaintiff

23    O   CT 173-83         Discovery Motion, Revak orders discovery          5

24    P   CT 269-283        Discovery Motion, missing Danish evidence         5

25    Q   CT 316-322        Discovery Motion, Editted photo logs             10

26    R   CT 683-7          DORT, People's motion, prosecutorial misconduct  12

27        RT 230-1, 534-5   Court, order on DORT's misconduct

28                               - iii -
```

1  **EXHIBITS**, continued

2  S   CT 731-40              Discovery Motion, final missing evidence        5

3  T                          Letter to Plaintiff from State Bar Assoc       12

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1  Paul Whitmore
   G-40654
2  CSP-Corcoran
   P.O. Box 3471
3  Corcoran, CA  93212-3471

4  In Pro Se

5

6                 IN THE UNITED STATES DISTRICT COURT

7              FOR THE SOUTHERN DISTRICT OF CALIFORNIA

8

9  PAUL GORDON WHITMORE,              )   Case No.: _____
                                      )
10          Plaintiff,                )   CASE \NARRATIVE
                                      )
11 v.,                                )
                                      )
12 JEFFERY DORT, ADA, et al.;         )
                                      )
13 .        Defendants.               )
                                      )
14 |_____)

15                SALIENT HISTORY OF THE CASE

16    In November 2001, the Swedish  group Save the Children received an anonymous

17 tip that hard-core, bondage child pornography had been posted to a newsgroup[1].

18 A senior official, Per-Erik Angstrom, downloaded the images and found that they

19 didnot exist in their database, i.e., they are a new, unknown source. In one

20 image, there was an obese Nordic man with a workshirt with his name and a

21 company name visable in the photo. Angstrom recognized this as a Danish Internet

22 Service Provider (ISP) and forwarded the images to Danish national Police.

23 Investigation showed that the individual, Eggert Jensen, no longer worked at

24 the ISP, but still lived in Tarm, Denmark. Local police were alerted and Jensen

25 was arrested later the same day that the 'tip' had arrived in Swedish ' During

26 his interrogation, Jensen admitted to molesting his step-daughter, Jeanette

[1] A newsgroup is an 'electronic bulletinboard' allowing users to semi-anonymously
27 post messages and photographs encoded as UUE. Messages are public, accessable
28 to anyone with internet access.

                            - 1 -

1  age 9, and trading (and selling) child pornography with over 80 other people

2  over the Internet. Police seized the computer in the home, an envalope with

3  Plaintiff's return address, and arrested Jensen's wife, Bente, Jeanette's

4  mother, who also admitted to sexual abuse of Jeanette.

5  Using the password that Jensen provided, the Danish police collected evidence

6  from the computer consisting of digital images (photos), chat logs[2], FTP logs[3],

7  and more than eighty IP addresses[4]. The Danish police contacted the U.S. Customs

8  office in Berlin, Germany, in December 2001. This evidence was disseminated to

9  various agencies in the U.S, including San Diego (SD) Sheriff's officer Stephanie

10  Guerra, Named Defendant.

11  Although Plaintiff was not the first person arrested in the U.S., Emmerson

12  in Clovis was arrested a day earlier, Guerra used only evidence from the Danish

13  CD in her search and arrest warrent affidavit, served on Plaintiff. SD officers

14  including Guerra went to Denmark, and European officers including Underbjerg

15  went to San Diego, before the Danish police destroyed all the evidence collected

16  and most of the reports written in May of 2002. Numerous phone calls and Internet

17  communications (e-mails and texting, presumably) were exchanged between officers

18  in SD and Denmark during this time. The defense team learned of the destroyed

19  evidence and reports in the Summer of 2005.

20  Defense team made numerous motions for discovery, all of which were vigorously

21  resisted by Jeffery Dort, Named Defendant. During the preliminary hearing,

22  Judge Revak ruled that all evidence collected by the 'prosecution team' must be

23  given to the defense. This order defind 'prosecution team' as imclusive of

24  [2]A 'chat log' is a compilation of all 'conversations' by a Simple Messaging System,
SMS, or 'Texting' program. The log is a normal part of the SMS operations.

25  [3]FTP log is a listing of all files sent by a File Transfer Protocol program. Any
file sent over the Internet generates an FTP log, somewhere on the computer used.

26  [4]IP address is an Internet Protocol address. When any computer accesses the Internet,

27  it is assigned a unique number to identify it to the local URL server. Universal
Resource Locator servers use IP numbers, format xxx.xxx.xxx.xxx, to find and send

28  information to and from computers on the Internet.

- 2 -

7

1  the Danish police departments involved with the investigation. The Danish

2  destroyed all the evidence, inclupable as well as exculpable, and all the

3  interviews, as well as most of the reports. Plaintiff was convicted of over

4  50 counts using only secondary evidence, and sentenced to 467 years to life.

5  Jensen, who plead guilty to a similar number of identical charges, received

6  only two (2) years with time off of the sentence for cooperation with the

7  Danish investigation.

8      Plaintiff appealed his conviction, and the California Court of Appeals

9  found that there may have been errors however they were harmless, given the

10  'mountain of evidence' against the Plaintiff. This was supported by the ruling

11  of the U.S. District Court Magistrate. The U.S. Court of Appeals and the U.S.

12  Supreme Court denied review.

13                       **PROPRIETY OF THE INSTANT ACTION**

14      Plaitiff is suing for compensation and punitive damages resulting from

15  a denial of his flue process rights under the 5th and 14th Amendments. This

16  Due Process violation is inclusive of the right to receive from the prosecution

17  impeachment evidence, the right to receive evidence of mitigating factors,

18  and the right to receive evidence to support a third-party culpability defense.

19  This instant suit is brought under 42 USCA 1983, the "Anti-Klu Klux Klan Act".

20      Specifically, when the U.S. officers identified as Defendants to this

21  action, failed to secure and protect the evidence from the Danish investigation,

22  allowing it to be destroyed by the Danish police, along with all the interviews

23  and most of the reports of the Danish investigation, they violated the Plaintiff's

24  Due Process rights. These rights are identified by the U.S. Supreme Court in

25  Brady v Maryland (1963) 373 U.S. 83, 83 S.Ct. 1194.

26

27  ////

28                                   - 3 -

## PRISON LITIGATION REFORM ACT (PLRA) DOES NOT APPLY

The numerous requirments of the PLRA do not apply to the instant action as the PLRA applies solely to actions, "... in respect to prison conditions." While Plaintiff does not think that California's bloated prison system is constitutional, this is beyond the scope of this action. (42 USCA 1997e(a))

## ANTI-TERRORISM AND EFFECTIVE DEATH PENALTY ACT (AEDPA) DOES NOT APPLY

The AEDPA applies only to federal habeas actions from state convictions, under 28 USCA 2254 et seq. As this action does not implicate the validity of the conviction nor challenge the sentence, it is not under AEDPA.

## THE HECK RULE DOES NOT APPLY

Heck v Humphrey (1994) 512 U.S. 477, 114 S.Ct. 2364, does not bar the instant action as, should there be a favorable decision, it would not challenge the validity nor the sentence of the conviction. This distinction was futher delineated in Wilkerson v Dotson (2005) 544 U.S. 74, 125 S.Ct. 1242, by the U.S. Supreme Court. Should a civil action challenge the validity of the conviction or result in a shorter sentence, then it is blocked under the Heck Rule until the conviction is overturned by habeas. However, a civil action can procedd if, should the plaintiff prevail, the resulting decision would not question the validity of the conviction nor result in a shorter sentence.

Simply establishing a violation under Brady does not immediately suggest relief on habeas. (AZ v Youngblood (1988) 488 U.S. 51) A Brady violation is subject to harmless error as well. If the error resulted without prejudice to the defendant, or the error was caused without 'bad faith' on part of the prosecution, then no ground is found for an overturn under habeas.

However, a free-standing civil rights violation can lie where the underlying conviction is not challenged. (Faulkner v Co. of Kern (2006 U.S. Dist.

- 4 -

1   Lexis 44151)) In the instant case, neither the state nor federal courts have

2   ruled on the merit, only on the harm, of the violation. As such, should this

3   court find that a Brady violation occured, it would not change nor challenge

4   the conviction in any way. (Skinner v Switzer (2011) 562 U.S. ____ , 131 S.Ct.128

5   (Also see CA v Trombetta (1984) 467 U.S. 479)

6

7   <u>INSTANT ACTION IS NOW RIPE</u>

8       The actual destruction of the evidence and reports occured in May 2002 and

9   the defense team did not learn of this until 2005. (Exhibit P ) However, this

10   action was still premature until the U.S. Supreme Court had ruled on the crimina

11   aspect under habeas. This did not occur until March 2014. (Exhibit C ) Now

12   that the criminal courts (and appelate courts) are done, this case is now

13   ripe for civil action under 1983.

14

15                   **DEFENDANTS AND THEIR VIOLATIVE ACTIONS**

16   <u>JEFFERY DORT, ASSISTANT DISTRICT ATTORNEY</u>

17       From the initial hours of the investigation, DORT was the prosecuting

18   attorney assigned to the case and as such, was the 'leadman' for the prosecution

19   team. (Exhibit D ) At the preliminary trial, Judge Revak ordered DORT to discover

20   to Plaintiff's defense team all evidence and documents,interviews , and reports

21   from Denmark (and others as well). (Exhibit O ) DORT had a direct and supervisory

22   relationship with Stephanie GUERRA. DORT had the ultimate authority to ensure

23   that <u>Brady</u> materials were discovered to the defense, and that this evidence

24   was collected and preserved. Not only did DORT fail to preserve all the physical

25   evidence in this case from Denmark, he actively resisted all efforts of the

26   defense team to obtain such discovery. (Exhibit g ) DORT is sued as both an

27   individual and official capacity, and he acted at all times under the color

28

1  of authority of his office.

2

3  STEPHANIE GUERRA, SD SHERIFF'S DETECTIVE

4       GUERRA was the initial contact for U.S. Customs in SD county and was intimate

5  involved with the case from the inception. (Exhibit E) GUERRA was lead investigat

6  for SD. She was in frequent contact with Danish officers, and met with them

7  personally on two occasions before the evidence was destroyed. (Exhibit B)

8  As senior investigator she had responsibility to preserve and maintain potental

9  Brady materials, and she never did so. GUERRA is sued in both individual and

10 official capacity, and at all times was acting under the color of authority

11 of her office.

12 PAUL **PFINGST**, DISTRICT ATTORNEY THROUGH JANUARY 2002, SD COUNTY

13      **PFINGST** was the elected DA for San Diego County (SD) at the time of Plaintiff

14 arrest. In November he was not reelected, and continued to serve until some

15 time in January 2002. He was the DA during the initial investigations and

16 destruction of the Danish evidence. Given the very high profile case, it is

17 impossible to imagine that **PFINGST** didn't have close contact with DORT. **PFINGST**

18 is sued in both his individual and official capacity and at all times acted

19 under the color of authority of his office.

20
   BONNIE DUMANIS, SD DA FROM JANUARY 2002

21      DUMANIS was elected and took office in January 2002, replacing PHINGST.

22 While the evidence was already destroyed, DUMANIS did nothing to try to

23 ameliorate the damage done. If nothing else, she could have offered the Plaintiff

24 a reasonable plea bargain: prior to trial, Plaintiff offered 25-life and was

25 rejected; however codefendant Rowland was offered and accepted 15-life.

26 DUMANIS is sued both individually and in official capacity, and at all times was

27 acting under color of the law.

28                                    - 6 -

1  DOES 1 - 5, UNKNOWN TO PLAINTIFF

2     DOES 1 through 5 are officers/investigators unknown to Plaintiff who were

3  involved with the evidence from Denmark, and the related interviews and reports.

4  As U.S. officers, they too had duty under Brady. While some of these officers

5  may be federal or other counties, this case will be limitted to SD officers.

6  Plaintiff will use discovery to identify these officers.

7  DOES 1-5 are sued in individual and official capacity, and at all times were

8  acting under color of authority of their offices.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27  ////

28

1                               **ARGUMENT**

2   **PLAINTIFF WAS DENIED IMPEACHMENT EVIDENCE**

3       Danish officers testified that there was much more information on the

4   Danish computer than was given to U.S. officers, however now that the computer

5   was destroyed there was no way to recover it. (Exhibit A) They also admitted

6   on the stand that most of the reports and all interviews were destroyed as

7   well. (Exhibit A)

8       At trial, the defense team argued that the the 'child porn' was faked,

9   and did not depict   : molests. (Numerous, almost all photos, were disputed

10   as to being pornography, under Kongs. However, the actual 'molest' images

11   were contested as artifical, 'trick' photos. (P. vKongs (1994) 30 Cal.App.4th

12   1134) This proved such a threat to the prosecution that they retained an 'expert

13   to testify about the authenticity of the video clips. Mark Menz opined that

14   he could tell the videos were 'straight' shots, not composites, because of

15   the absence of 'snow' - artifacts. (Exhibit G ) This is proof by the absence

16   of contrary evidence, i.e. that it's proven because there is no evidence to

17   dispute it. When questioned, Menz stated that there was no evidence showing

18   it was faked, though it was possible. (Exhibit G')  He further stated that,

19   if they were fakes, where  were the 'production product', the source photographs

20   that were merged to create fakes? Menz, and other experts as well, testified

21   about not being able to be sure, but only "99.9999%" sure of the truth of

22   the evidence. (Exhibit H) Prior to trial, the defense moved to suppress the

23   Danish evidence for a lack of foundation, the prosecution (DORT) responded

24   that there was 'no evidence' to suggest any images were faked. (Exhibit F')

25       In fact, there was some evidence to suggest that the images may have been

26   faked. Only two of the seven victims 'remembered' being molested, and these

27   two couldn't describe molests depicted  in images found. Both Danish officer

28                                   - 8 -

1  Pallenson and U.S. Customs expert Johnson testified about Jensen and Plaintiff
2  'morphing' photos, i.e. digital editting of the images. (Exhibit N) Had the
3  computer, or a full copy of the hard disk, been available to defense, it is
4  possible that the 'production products' would have been found, and this would
5  have gome to impeachment of the 'experts' who testified. When the DEFENDANTS
6  failed to protect and preserve the Brady materials, they denied this evidence
7  for impeachment.

8  Under California's EC 1552, a 'printout' is considered accurate and must
9  be rebutted with evidence showing it isn't accurate. While the DEFENDANTS
10 claimed that Plaintiff exchanged hundreds of filed with Jensen, only a few
11 FTP logs were found. Menz explained  this as "multiple modes of failure can
12 occur in a computer." (Exhibit I) If the computer was, in fact, malfunctioning,
13 this under EC 1553 would have rendered the digital evidence inadmissable. However
14 since the computer was not retained for the defense, this area of investigation
15 and argument was denied the defense. Even Danish forensic reports would have
16 been helpful, but these were destroyed too. (Exhibit P)

17 PLAINTIFF WAS DENIED MITIGATING EVIDENCE

18 Throughout the police reports, Plaintiff's codefendants were accusing
19 each other of blackmailing them, thus explaining why they did what they did.
20 At trial some evidence of blackmail did come forward. Cassida, an officer
21 from Clovis, California, an  investigator handling Emmerson, a codefendant
22 of Plaintiff, testified that Emmerson was an 'extreme packrat' of )digital
23 files. (Exhibit J) Cassida went on to state that much of what was kept was
24 'incriminating' evidence - possible blackmail material. Had Jensen been
25 blackmailing Plaintiff, this could have tended to expalin what occured, and
26 could have led to a lower sentence or better plea bargain. Either the computer
27 or the reports could have had such, or the interviews with Jensen. All of
28 tni

- 9 -

1    this mitigating evidence was destroyed in May 2002 by Danish officers.

2

3    PLAINTIFF WAS DENIED 3RD PARTY CULPABILITY DEFENSE

        Plaintiff's defense counsel attempted to raise this as a defense, however

4    this was denied by the court because of a lack of evidence. (Exhibits K, L)

5    The only person who consistently identified Plaintiff and victims in the photos

6    was Defendant Guerra. All the victims had difficulty identifying Plaintiff

7    by bodypart only (the "hairy hand") and several even had difficulty identifying

8    themselves. Photos of Plaintiff's and co-defendant Rowland's hands were admitted

9    to 'prove' it was Plaintiff, however none of the other federal co-defendant's

10   hands were photographed. Jeanette and victim "M" were tha same age, 9, same

11   size, same skin and hair color, and even had similar builds. It would have

12   been an easy thing to take "M"'s head and digitally place it on Jeanette's

13   body being molested, creating a photo of "M" being molested that never occured.

14      GUERRA testified that she identified "M" in the photos not showing her

15   face from photos showing her face. This is a flawed procedeure in that it

16   assumes that "M"'s head is on "M"'s body in the photo. Had she checked the

17   photos against "M" in person, this would have prevented this error from occuring,

18   but she didn't. Even GUERRA's testimony could be flawed, had the defense been

19   able to have evidence from the Danish computer and investigation - but this

20   was destroyed and none of the Defendants ever moved to protect this source

21   of evidence. (Exhibits M, Q)

22      At trial, the 'chat log' was contested as being not just Plaintiff's chats

23   but the blended 'log' of several different people chatting with Jensen. Had

24   the computer or interviews been available to the defense, then a cogent challenge

25   to the keystone piece of evidence for the prosecution, the 91-page 'chat log'

26   People's 85, could have been made. With no evidence, it came in w/ little

27   effort on part of the People.

28                                    - 10 -

NOT PRESERVING THE BRADY MATERIALS VIOLATED THE 5th AND 14th AMENDMENTS

Evidence of impeachment, actual innocence, third-party culpability, mitigatin factors are materials required to be turned over to the defense when in the control of the prosecution team. (Brady, supra; Smith v Shortt 2008 U.S. Dist. Lexis 96267; U.S. v Brown (CA4 2011) 650 F.3d 581)(U.S. v Doe (CA9 2013) 705 F.3d 1134) Clearly, not turning over this evidence, not securing the computer and reports and interviews, prevented the defense from raising valid arguments. The criminal courts have ruled that such error, if it was error, was harmless beyond a reasonable doubt, viewed in light most favorable to the prosecution.

Brady Rights in 1983 Actions

In 1983 actions, the Plaintiff must show that a Brady violation occured, and was not the result of simple negligence. (Faulkner, supra; Daniels v Williams (1986) 474 U.S. 327, 106 S.Ct. 622; Davidson v Cannon (1986) 474 U.S. 344, 349 S.Ct. 688) The violation is on the record. GUERRA met with the Danish on two occasions personally, and had numerous phone and Internet comm-unications with the Danish officers before the evidence was destroyed. (Exhibits A, B) The evidence was destroyed in May 2002, by Danish police officers, along with reports and interviews. (Exhibit A, P, S)

All officers are charged with preventing civil rights violations. (James v Rowlands  (CA9 2009) 606 F.3d 646) The Brady case was decided in 1963, and it is a keystone of police activity and the methods of investigation ever since. (Youngblood, supra; Trombetta, supra)  The prosecutor, and his lead investigator, are most responsible for preserving the Brady material. (Faulkner, supra) In the instant case, this is DORT and GUERRA, respectively.

It is impossible to argue that this, gross Brady violation could be simple negligence. GUERRA had plenty of time and opportunity to secure the evidence

- 11 -

1 | and investigative records.

2 |     DORT had engaged in numerous acts of questionable behavior for a prosecutor,

3 | and one incident of outright misconduct. (Exhibit R) DORT referred to Plaintiff

4 | as a 'monster', 'subhuman specimin' and other childish acts of name-calling

5 | both verbally and in motions before the court.Further, in one motion (Exhibit R)

6 | he threatened defense counsel with prosecution should he continue to try to

7 | get potentially exculpable evidence from "M"'s medical records. This was dealt

8 | with by trial counsel, but goes to show the thinly veiled, personal contempt

9 | that DORT had for Plaintiff. Even the California Bar Association stated that

10 | such behavior was 'not to be condoned'. (Exhibit T) This purile behavior

11 | is evidence that DORT not only committed gross negligence, but even intentional

12 | disregard for Plaintiff's civil rights.

13 |     GUERRA was a senior Sheriff's Detective, having prosecuted numerous cases

14 | both of sexual offences and drug offences. San Diego is a major hub of drug

15 | trafficking, and physical evidence, chain of evidence, Brady material, would

16 | be common concerns of police investigating the numerous Mexico-related drug

17 | cartels. It is mmimaginaBle to think such a seasoned, experienced officer

18 | could have simply 'forgot' her obligations under Brady. Even Postal Inspection

19 | officer Philip Garn complained on the stand that he had not been informed

20 | by GUERRA that an investigation was ongoing in Plaintiff's case, and he destroyed

21 | evidence of Plaintiff's P.O. Box after two years (and more than eighteen months

22 | before Plaintiff came to trial). While discovery of the P.O. Box is not, in

23 | the Plaintiff's opinion, significant Brady material, it goes to show the cavilier

24 | attitude regarding Plaintiff's civil rights that GUERRA displayed.

25 |

CONCLUSION

26 |

27 |     The case is quite clear. A Brady violation of very significant magnitude

28 | occured when the Defendants allowed the Danish police to destroy the source

- 12 -

1   of the case, the source of all the evidence used to arrest Plaintiff, the

2   source of all the evidence used at trial save for the victims' statements:

3   Jensen's computer. If that wasn't bad enough, defense counsel was also denied

4   access to all investigation reports and interrogation records, receiving only

5   general investigative reports and, ironically, a list of all the evidence,

6   notes, reports and physical evidence that was destroyed.

7   DORT engaged in obvious smearing of Plaitniff in trial and even engaged

8   in prosecutorial misconduct to prevent defense counsel from receiving potentially

9   exculpable evidence. GUERRA was so cavilier in her management of the evidence

10   that she didn't even inform co-arresting officer Philip Garn of the pending

11   case against Plaintiff. PHINGST was the DA overseeing a department with the

12   biggest 'kiddieporn' case in history thus far and was obviously complicit

13   in the failure to secure evidence. DUMANIS never negotiated in good faith,

14   wanting a big, splashy trial to help her bid(s) for reelection and overall

15   political clout. DOES 1-5 were subordinate to GUERRA as lead investigator,

16   however the U.S. Supreme Court has already ruled that ALL officers of the

17   government have a duty to prevent civil rights violations of citizens, even

18   the accused.

19

20

21

22

23

24

25

26

27   ////

28                                     - 13 -

## PRAYER TO THE COURT

1

2      Plaintiff prays this court for five-hundred-thousand dollars ($500,000**)

3  for damages, to allow him to retain counsel, hire investigators, expert witnesses,

4  and related activities including logistics and support to mount a cogent attack

5  on the conviction and sentence.  Plaintiff futher prays for four-million-

6  five-hundred-thousand dollars ($4,500,000**) for punitive damages. The failure

7  to discover to the defense obvious Brady material was grossly negligant,

8  rackless, and probably intentional. When GUERRA and DORT decided not to move

9  to secure the source of Danish evidence, 90% of their case against Plaintiff,

10 Plaintiff was hobbled in his defense to the point that conviction was inevitable.

11 While the criminal courts have ruled that, if a Brady occured, the error was

12 harmless based on the record at trial, this does not prevent this court from

13 ruling that a Brady error did occur, DEFENDANTS committed it, and the error

14 is worthy of a 5-million dollar award.

15

16 I declare under penalty of perjury under the laws of the United States that

17 the foregoing was both true and correct.

18                                         Respectfully Submitted,

19

20  12/9/2014
        date

21                                         Plaintiff

22

23

24

25

26

27

28                              - 14 -

<u>EXHIBITS ATTACHED TO COMPLAINT</u>

CASE NUMBER: _____

CASE NAME: WHITMORE V DORT, et al.

NOTE: Exhibit Index is in the Introduction to Attached Case Narrative

E X H I B I T     A

1    did he leave the computer with you?

2              (The interpreter repeats the question in English.)

3         THE COURT:  Excuse me, Madam Interpreter.

4         THE INTERPRETER:  Oh, sorry.  Sorry.

5         THE COURT:  I realize that the witness understands English,

6    but you'll have to translate the English into Danish.

7         THE INTERPRETER:  Of course.  I'm sorry.

8         THE WITNESS:  As I remember, he took what he needed from the

9    computer to examine what he was going to investigate.  The box

10   itself was back, but he took what he needed to -- to investigate.

11   BY MR. ROBERTS:

12        Q.    So the computer remained in Ringkoebing?

13        A.    I'm not quite clear what you mean about the computer.

14        Q.    Okay.  Do you have People's Exhibit 60?  I'm asking

15   you.  Do you have it?

16        A.    It's right here.

17        Q.    Okay.  And you prepared that report?

18        A.    Yes.

19        Q.    And that's an evidence report.

20        A.    Yes.  It's a Koster report.  It's a report -- the

21   purpose of this report is that we are listing the effects that we

22   took from the house search.

23        Q.    And just for the record, People's Exhibit 60 is

24   discovery pages 3007 to 3010.

25              And this is the original handwriting, directing your

26   attention to --

27        A.    Yes.

28        Q.    Okay.  And all of the items that are listed there have

1    since been destroyed; correct?

2         A.    What is listed here, where I have -- where I have

3    indicated that the material has been destructed and then I have

4    signed it, that's correct, after the case was finalized.

5         Q.    And, basically, all of the items listed in that report

6    have been destroyed; correct?

7         A.    In the case where it's written on each listed item that

8    the item has been destroyed, and it's been signed by me, yes, the

9    item has been destroyed.

10        Q.    Okay.  And so item 1 was destroyed; correct?

11        MR. DORT:  Objection.  Asked and answered.

12        THE COURT:  Overruled.

13        THE WITNESS:  Yes.  But it also adds in handwriting, however,

14   "not the hard disk."  The hard disk was taken out minus,

15   indicating, however not the hard disk.

16   BY MR. ROBERTS:

17        Q.    So what happened to the hard disk?

18        A.    It's the hard disk that Frank utilized to get his data.

19        Q.    Where is it now?

20        A.    I don't know (in English).

21        Q.    What is item 2?

22        A.    It's a digital camera.

23        Q.    And that was destroyed?

24        MR. DORT:  Objection.  Relevance.

25        THE COURT:  Sustained.

26   BY MR. ROBERTS:

27        Q.    And item 3, what is that?

28        MR. DORT:  Objection.  Relevance.  Beyond the scope.

E X H I B I T        B

1   is it that you were able to assist the other investigators?   How

2   did you get that information from your department to other

3   departments?   Who did you call or meet with?

4         A.    When the case started, we had had some connection with

5   the Customs attaché in Berlin in other cases, and we invited him

6   up and presented the material regarding the U.S. suspect and asked

7   if they would take over, and they said yes.

8         Q.    And since that meeting with the -- would that have been

9   the Berlin attaché to the U.S. Customs Department?

10        A.    Yes.

11        Q.    Since that time, have you worked with U.S. Customs over

12   the last four years?

13        A.    Yes.

14        Q.    Specifically after Customs got the case, were you

15   pretty much done with the U.S. investigation?

16        A.    No.

17        Q.    Why not?

18        A.    Because there was a lot of follow-up questions, and

19   often in those cases, the material regarding one country isn't, in

20   fact, in the country where the abuse had taken place.   But we have

21   to go out and make sure that the other countries look through

22   their evidence, knowing that we had a very severe ongoing abuse

23   and they might be in possession of evidence specific for this

24   case.   So we actually called in all the investigators in this case

25   and presented what kind of material we had so that everybody could

26   be aware of what they were going to look for.

27        Q.    So as far as the investigation that you were doing in

28   Copenhagen, it didn't stop there; is that correct?   I mean, after

1    the material and started working on it until -- until I was able

2    to put all of these pieces together.  And I believe the first

3    arrest outside Denmark occurred in middle of January and started

4    from there.  And then all the main -- what I call the main

5    suspects in this case, they were arrested within a very short time

6    after that, because whenever a suspect was caught, we had new

7    information going to the other suspects.

8    BY MR. DORT:

9        Q.    And from the middle of January until what time until

10   most of the main suspects were arrested?

11       MR. ROBERTS:  Again, objection.  Relevancy.

12       THE COURT:  Counsel?

13       MR. DORT:  Just as far as setting up a foundation for a

14   further time line.

15       THE COURT:  Relevance?  Objection sustained at this point.

16   BY MR. DORT:

17       Q.    After the middle of January, did you receive

18   communication from a Detective Guerra in San Diego?

19       A.    Yes.

20       Q.    And did you work with Detective Guerra in regards to

21   the case and information that you had worked on on Jensen's

22   computer, to assist her in the investigation of Paul Whitmore?

23       A.    Yes.

24       Q.    Although first you gave the information to the United

25   States Customs, at some point were you then working with

26   individual detectives literally throughout the world on this case?

27       A.    Yes.

28       Q.    Would you then go back into the computer to assist that

```
 1     detective to help them either identify specifically who you were

 2     talking about or more information, or had they gotten all of the

 3     information by the time the middle of January 2002 had come

 4     around?

 5              MR. ROBERTS:  Objection.  Relevance.

 6              THE COURT:  Sustained.

 7     BY MR. DORT:

 8         Q.   Did you send -- by the middle of January, were you done

 9     with your investigation?

10         A.   What year?

11         Q.   2002.

12         A.   No.

13         Q.   You said that you're still working on it now.  But at

14     some point --

15         A.   Yes.

16         Q.   -- had you sort of reached the bottom of the barrel in

17     the sense of finding out information?

18              MR. ROBERTS:  Objection.  Irrelevant.

19              THE COURT:  Overruled.

20                   You may answer the question.

21              THE WITNESS:  The forensics were done within three or four

22     months -- overall forensics.  Then the material was -- I worked on

23     the material, producing those different packages.  Could be that I

24     got a request concerning something specific.  I could go back.

25     But otherwise, the forensic part of it was done with.

26     BY MR. DORT:

27         Q.   I'm sorry.  I didn't hear the last part.  The forensic

28     part was done --
```

Oct 28, 2005   180

1    MR. DORT:   FOR SUBSEQUENT CONDUCT JUST AS INVESTIGATION.

2    THE COURT:   IT'S NOT BEING ADMITTED FOR THE TRUTH OF THE

3  MATTER AT THIS TIME BUT TO EXPLAIN ITS EFFECT ON THE LISTENER.

4    MR. DORT:   YOU MAY CONTINUE.

5    THE WITNESS:   AT THAT POINT I LEARNED THAT PAUL WHITMORE DID

6  IN FACT HAVE A DAUGHTER WHO WAS ABOUT NINE YEARS OLD WHOSE NAME

7  WAS MENOLLY.

8  BY MR. DORT:

9    Q    THIS IS STILL ON FRIDAY, JANUARY 25TH?

10   A    YES.

11   Q    OKAY.

12        BASED ON THE INFORMATION THAT YOU HAD AT THAT POINT, IS

13 THAT WHEN YOU MADE A PHONE CALL OR WERE ABLE TO GET IN CONTACT

14 WITH LARS UNDERBJERG?

15   A    LATER ON, YES.

16   Q    OKAY.

17        WAS THERE SOMETHING THAT YOU DID BETWEEN CONFIRMING

18 THAT THERE WAS A CHILD OF PAUL WHITMORE BEFORE YOU GOT TO TALKING

19 TO LARS UNDERBJERG?

20   A    THERE WAS BASIC, FROM MY POINT OF VIEW BASIC

21 INVESTIGATORY STEPS I TOOK, CHECKING FOR CRIMINAL HISTORIES ON

22 THE PERSON, RUNNING DRIVER'S LICENSE CHECKS, JUST BASIC

23 PRELIMINARY INVESTIGATION ON MY POINT -- ON MY PART.

24   Q    IS THAT BACKGROUND THAT YOU DO ON BASICALLY ANY

25 INVESTIGATION?

26   A    YES.

27   Q    AND WHEN YOU HAD COMPLETED THAT, DID YOU ALSO AT THAT

28 POINT GET IN CONTACT WITH LARS UNDERBJERG OR HAD HE CALLED YOU?

1      A      HE ARRANGED THROUGH A REPRESENTATIVE OF CUSTOMS C3 TO

2   MAKE A THREE-WAY CONVERSATION, THREE-WAY PHONE CALL.

3      Q      SO IT'S YOU, LARS UNDERBJERG, AND SOMEONE FROM THE

4   CUSTOMS C3 CENTER?

5      A      YES.

6      Q      DID YOU LEARN, WITHOUT TELLING US WHAT EVERYONE IS

7   SAYING IN THE CONVERSATION, DID YOU START TO LEARN MORE ABOUT THE

8   CASE AND THE INVESTIGATION?

9      A      YES.

10     Q      DID THAT ASSIST YOU IN STARTING TO PUT THE PIECES

11  TOGETHER AS FAR AS HOW PAUL WHITMORE FITS IN WITH YOUR

12  INVESTIGATION --

13     A      YES.

14     Q      -- AND WHAT YOU NEEDED TO DO?

15     A      YES.

16     Q      AFTER YOU HUNG UP THE PHONE ON THIS THREE-WAY PHONE

17  CALL BETWEEN C3, YOURSELF, AND LARS UNDERBJERG, DID YOU FEEL YOU

18  HAD ENOUGH TO DO A SEARCH WARRANT?

19     A      INITIALLY, YES, I DID.  I FELT THAT AS A MANDATED

20  REPORTER IN THE STATE OF CALIFORNIA, IF I BELIEVE THERE IS A

21  SUSPECTED CHILD ABUSE, I'M REQUIRED TO REPORT IT TO C. P. S.  MY

22  CONCERN AT THE TIME WAS I HAVE TO MAKE THIS REPORT, IS C. P. S.

23  GOING TO IMMEDIATELY GO OUT AND INTERVIEW THE VICTIM AND

24  JEOPARDIZE MY INVESTIGATION BY LETTING THE SUSPECT KNOW.  SO

25  INITIALLY I BELIEVED THAT THERE WAS SOME EXIGENCY, AND I WAS

26  PREPARING TO DO A SEARCH WARRANT THAT NIGHT.

27     Q      AND DID YOU START TO WRITE REPORTS OR -- WHAT DO YOU

28  HAVE TO DO TO DO A SEARCH WARRANT?

BY MR. DORT:

Q.    Were you shown pictures of children involved in this case?

MR. ROBERTS:  Objection.  Hearsay.

MR. DORT:  Expert opinion.

MR. ROBERTS:  Vague and ambiguous; "shown."  "Were you shown."

THE COURT:  Overruled.

BY MR. DORT:

Q.    You may answer.

THE COURT:  You may answer the question.

THE WITNESS:  I'm sorry.  Yes, I did.

BY MR. DORT:

Q.    How is it that you gained information as far as who was involved in this case, names, pictures, things like that?

A.    We had a conference at the RCFL shortly after the case began, and investigators from Europe came over, who spoke of some of the principals of the case at that time.  Also had other pictures of them from Stephanie Guerra, and there were -- some of the pictures were named in directories that indicated the name of the child.

Q.    Did you use that information as you were going through the various parts of this case?

A.    Yes, I did.

Q.    Did that assist you, as far as finding pictures of what you thought were the same child?

A.    Yes, it did.

Q.    And did you refer back to those pictures to verify,

Guerra
DEF Nov 12 2005

3054

1    correct?

2         A.    Yes.

3         Q.    And you said that when you were doing your

4    investigation, the one person that you had the most contact with

5    was John Weaver, the police officer with the Clovis Police

6    Department?

7         A.    I don't think that's correctly stated.  I think the

8    question might have been the person -- the other law enforcement

9    agenct in Clovis who I had the most contact with, and that would

10   have been John Weaver from Clovis.

11        Q.    Okay.  But then you also had a fair amount of contact

12   with Lars Underbjerg in Denmark; correct?

13        A.    No.  Not quite as much as John Weaver.

14        Q.    Okay.  You spoke more with Weaver than you did with

15   Underbjerg?

16        A.    Yes, that's correct.

17        Q.    Okay.  But would you agree that you spoke a number of

18   times and communicated a number of times with Mr. Underbjerg;

19   correct?

20        A.    In the beginning part of the investigation, yes.

21        Q.    Okay.  By telephone or by e-mail, or was there one form

22   of communication that was used over the other?

23        A.    There was telephone calls, and I believe there may have

24   been one or two e-mails.

25        Q.    Okay.  Basically, there were three anchors in this

26   investigation.  There was Underbjerg in Denmark, there was Weaver

27   in Clovis, and you here in San Diego; correct?

28        A.    Define "anchors."

E X H I B I T     C

# Supreme Court of the United States
## Office of the Clerk
## Washington, DC  20543-0001

Scott S. Harris
Clerk of the Court
(202) 479-3011

April 7, 2014

Mr. Paul Gordon Whitmore
Prisoner ID G40654
P.O. Box 3471
Corcoran, CA  93212

Re:  Paul Gordon Whitmore
v. Jeffrey Beard, Secretary, California Department of Corrections
and Rehabilitation
No. 13-8472

Dear Mr. Whitmore:

The Court today entered the following order in the above-entitled case:

The petition for a writ of certiorari is denied.

Sincerely,

Scott S. Harris, Clerk

E X H I B I T     D

This affidavit has been reviewed by Deputy District Attorney

~~Jeff Dort.~~ PAUL AZEVEDO,
S4
PER JUDGE

Given under my hand and dated this

_Stephanie Guerra_

AFFIANT

Subscribed and sworn to before me this (date) 1-27-02 at 4.07

a.m. / p.m.

Judge of the Superior Court

San Diego Judicial District

000418

E X H I B I T      E

Stephanie Sherry

Oct 28, 2005   (2)2

950

1    Q    HOW HAS THAT ASSISTED YOU IN YOUR INVESTIGATIONS?

2    A    IF INFORMATION LEADS TO A DIFFERENT JURISDICTION IN THE

3  STATE OF CALIFORNIA OR IN A DIFFERENT STATE, THERE ARE CONTACTS I

4  CAN CALL.  WE ALL HAVE LISTS OF THE OTHER TASK FORCES.  AND I CAN

5  CALL UP AND JUST KNOWING THAT WE ALL WORK THIS TASK FORCE, THEY

6  CAN HELP ME WITH INVESTIGATIONS OR PROVIDING LEADS; OR IF MY

7  SUSPECT ENDS UP BEING IN THEIR JURISDICTION, I CAN PREPARE A

8  REPORT AND THEN GIVE IT TO THEM FOR THEIR CONTINUED FOLLOWUP.

9    Q    IN YOUR INTERNET CRIMES AGAINST CHILDREN TRAINING, DID

10 YOU FIND THAT THAT WAS HELPFUL?

11   A    EXTREMELY.

12   Q    HOW ARE INTERNET CRIMES DIFFERENT THAN, LET'S SAY, THE

13 CHILD ABUSE CRIMES YOU WERE WORKING AT BEFORE YOU WERE

14 TRANSFERRED TO THE TASK FORCE?

15   A    WHEN YOU'RE DEALING WITH INTERNET CRIMES, THERE ARE NO

16 BOUNDARIES.  I MEAN GENERALLY ON A, YOU KNOW, LIKE A ROBBERY,

17 SUSPECT AND VICTIM MIGHT LIVE IN THE SAME CITY OR THEY AT LEAST

18 LIVE IN SAN DIEGO COUNTY OR IT HAPPENED NEARBY.  BUT WHEN YOU'RE

19 DEALING WITH THE INTERNET, YOU COULD BE COMMUNICATING WITH

20 SOMEBODY OVER THE INTERNET WHO MIGHT LIVE IN MAINE OR NEW YORK OR

21 IN DENMARK.  AND SO THERE ARE NO BOUNDARIES WHEN YOU'RE DEALING

22 WITH INTERNET CRIME, SO WE NEED TO HAVE THE CONTACTS THAT ARE

23 OUTSIDE OF OUR OWN SMALL JURISDICTIONS.

24   Q    WERE YOU ASSIGNED AS THE DETECTIVE AS FAR AS

25 INVESTIGATING THE CASE VERSUS PAUL WHITMORE?

26   A    YES.

27   Q    WHEN DID YOU FIRST GET YOUR INFORMATION IN REGARDS TO A

28 SUSPECT BY THE NAME OF PAUL WHITMORE?

1    A    JANUARY 25TH, 2001.

2    Q    WHAT WAS THAT INFORMATION?

3    A    IT WAS A FAX THAT THE ICAC OFFICE WHERE I WAS WORKING

4  HAD RECEIVED FROM U. S. CUSTOMS CYBER SMUGGLING CENTER IN

5  ALEXANDRIA, VIRGINIA.

6    Q    IS THAT SOMETIMES REFERRED TO AS C3?

7    A    YES.

8    Q    AND ARE THERE 3 C'S IN THEIR NAME?

9    A    CYBER SMUGGLING CENTER.

10    Q    CYBER CUSTOMS CENTER OR CUSTOMS CYBER CENTER?

11    A    SOMETHING LIKE THAT, YES.

12    Q    AND WAS THAT FAXED TO YOU?

13    A    NO.

14    Q    WHO WAS THE FAX TO?

15    A    IT WAS A FAX THAT WAS ADDRESSED TO LISA FAIRCHILD, WHO

16  WAS THE CUSTOMS AGENT AT THE TIME THAT WORKED WITH THE TASK

17  FORCE.

18    Q    AND YOU KNEW HER AND WORKED WITH HER?

19    A    YES.

20    Q    THE INFORMATION THAT WAS FAXED TO THE OFFICE, WERE YOU

21  ASKED TO FOLLOW UP ON THAT AND ASSIST IN THAT INVESTIGATION?

22    A    YES.

23    Q    AND YOU BASICALLY TOOK OVER THE ROLE AS THE LEAD

24  INVESTIGATOR.

25    A    YES.

26    Q    HOW WAS IT THAT YOU STARTED TO GET MORE INFORMATION?

27  YOU SAID THAT THE FIRST INFORMATION IS THIS FAX.  HOW IS IT THAT

28  YOU START TO GAIN INFORMATION?

**E X H I B I T          F**

1  BONNIE DUMANIS
   District Attorney
2  JEFFREY A. DORT, SBN 149295
   Deputy District Attorney
3  San Diego Hall of Justice,
   330 West Broadway, Suite 1220
4  San Diego, California 92101
   (619) 531-4295
5

6  Attorneys for Plaintiff

7

F I L E D
Clerk of the Superior Court

SEP 3 0 2005

By: F. McCurley, Deputy

8            SUPERIOR COURT OF THE STATE OF CALIFORNIA

9                 FOR THE COUNTY OF SAN DIEGO

10                       CENTRAL DIVISION

11  THE PEOPLE OF THE STATE OF CALIFORNIA,      CT No.  SCD 165314
                                                DA No.  AAQ272
12                                 Plaintiff,
                                                OPPOSITION TO DEFENSE MOTION
13              v.                               TO SUPPRESS EVIDENCE PURSUANT
                                                TO PENAL CODE § 1538.5– ROUND II
14  PAUL WHITMORE and
15  BROOKE ROWLAND,                             Date:   October 5, 6 and 7
                                                Time:   9:00
16                                Defendants.   Estimate: 2 days
                                                Witnesses: 1
17                                              Dept.:  40

18

19          Comes now the plaintiff, the People of the State of California, by and through its

20  attorneys, BONNIE DUMANIS, District Attorney, JEFFREY DORT, Deputy District Attorney,

21  and respectfully submits the following Opposition to Defense Motion to Suppress Evidence –

22  Round II.

23

24

25                                      I.
26              THE DEFENDANT'S MOTION IS GROUNDLESS

27      Defendant Whitmore wishes to challenge the evidence seized in Denmark ("pri-

28  mary evidence"), but has already litigated that issue at a 1538.5 hearing and lost.  Defendant

Whitmore also wishes to challenge the evidence seized at his own house, but not by challenging the warrant via a *Franks* hearing. The defense proposes a new theory for suppression of the videos: that they were seized *illegally by way of a warrantless search by an unknown third party.* The problem with this last line of attack is there no evidence of a warrantless search by anyone, only a guess based on an incorrect assumption.

The defense postulates that because there is not proof of how the oral copulation videos were sent from Whitmore's computer to Jensen's computer, then it MUST mean that someone "hacked" Whitmore's computer and stole the videos. This is illogical. While defense would prefer to see a FTP log proving how the video got from California to Denmark, the lack of its existence does NOT mean that Whitmore's computer was "hacked". Because there are numerous ways the video could have gotten onto Jensen's computer (Whitmore sent the video to Jensen on a CD, Whitmore sent the video via email to Emmerson and Emmerson sent it onto Jensen, etc) the defense argument fails both legally and logically.

The defense theory continues, since the People have not provided this "log" or other proof of how the video got to Denmark, the video have been "seized illegally" and therefore it was a warrantless search, and pursuant to case law, the burden is now on the People. However, as has been proven in the last suppression hearing, all of the evidence in this case was either (1) seized by warrant, (Whitmore's house warrant, Emmerson's house warrant, or Rowland's house warrant) or (2) on computers in which the defendant has no standing to object (Jensen's computer in Denmark). Therefore, defense's hybrid 1538.5/warrantless search motion fails as it does not have facts or law to support the granting of <u>another</u> suppression hearing.

Originally there was an idea that there would be two 1538.5 motions. However, the second round of 1538.5 motions were only to occur IF there were grounds found at the first motion that allowed the defense to call into question one of the original searches. Since the defense lost all of the 1538.5 motions in round one, there are no other 1538.5 motions to file. This court mentioned this procedural fact to all counsel at the last motion hearing. The only unexplored avenue for suppression of evidence is a traversal via a *Franks* hearing.

## II

## DEFENSE FAILS TO MAKE SUBSTANTIAL SHOWING AS IS REQUIRED TO TRAVERSE SEARCH WARRANT

While defense claims this is not a traversal motion, in fact they are questioning the veracity of Det. Guerra's statements *in* the affidavit, so it is a veiled attack on the warrant itself, and the People have included the law related to this type of motion. The leading case in this area is *Franks v. Delaware* (1978) 438 U.S. 154. Here, the Court held a defendant has a limited Fourth Amendment right to challenge the validity of a search warrant by controverting the factual allegations made in the supporting affidavit. A defendant is entitled to an evidentiary hearing on the affidavit's veracity *only after* making a *substantial preliminary showing* that:

- (1) the affidavit includes a false statement made "knowingly and intentionally, or with reckless disregard for the truth," and

- (2) "the allegedly false statement is necessary to the finding of probable cause." (*Id.* at pp. 155-156; *People v. Hobbs* (1994) 7 Cal.4th 948, 974; *People v. Luttenberger* (1990) 50 Cal.3d 1, 9-11.)

Because there is a presumption of validity in favor of the affidavit supporting a search warrant, a challenger's attack,

> [M]ust be more than conclusory and must be supported by more than a mere desire to cross examine. There must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof. They should point out specifically the portion of the warrant affidavit that is claimed to be false; and they should be accompanied by a statement of supporting reasons. Affidavits or sworn or otherwise reliable statements of witnesses should be furnished, or their absence satisfactorily explained. Allegations of negligence or innocent mistake are insufficient. (*Franks v. Delaware, supra*, 438 U.S. at p. 171.)

In addition to this substantial preliminary showing that a false statement knowingly and intentionally, or recklessly was included in the affidavit, a defendant must also show that when this misstatement is set to one side, the remaining content of the affidavit is insufficient to support a finding of probable cause. (*Id.* at pp. 171-172.) Only then is the defense entitled to an

evidentiary hearing.  If sufficient unchallenged information remains to support a finding of probable cause, the motion to traverse must be denied without a hearing.

A conclusory and uncorroborated defense declaration, which simply denies the acts alleged in the affidavit, or which appears to be unreliable because it is contradicted by established facts, is wholly insufficient to require a hearing.  (*People v. Box* (1993) 14 Cal.App.4th 177, 184-186; *People v. Sandlin* (1991) 230 Cal.App.3d 1310, 1318.)  Even a tape recorded statement of a witness disavowing information attributed to him in the search warrant affidavit has been held insufficient because it was unsworn.  (*People v. Box, supra,* at pp. 183-184.)  "In short, the message delivered by the highest judicial authority is plain. . . .  With specific reference to facially sufficient warrants issued by neutral magistrates, it is a rare day indeed when they can be successfully challenged.  One who ventures upon that effort better have his facts and figures, and they should be compelling.  A fishing expedition will not be entertained."  (*People v. Wilson* (1986) 182 Cal.App.3d 742, 750.)

## CONCLUSION

The People request that the Court deny this suppression motion.


Dated:  September 30, 2005

Respectfully submitted:

BONNIE DUMANIS
District Attorney

By: _____
JEFFREY A. DORT
Deputy District Attorney

Attorneys for Plaintiff

E X H I B I T        G

Oct 24, 2005

1     Q.     All right.  Have they told you what type of cameras

2    were seized from the Whitmore household?

3     A.     No.  I've only looked at the computer gear.

4     Q.     All right.  Okay.  I guess what I'm saying -- I guess

5    what I'm wondering is in the final analysis, isn't your opinion

6    basically just subjective rather than based on technical

7    evaluation of these videos, that it was -- that it would be

8    impossible to electronically paint the penis onto the video?

9     A.     Let me reiterate.  And this is not subjective.  This is

10   based upon the data and the facts that I'm looking at.

11          Number one, there is nothing in these videos that

12   indicates that this was composited.  Nothing.  Zero.  There is

13   evidence that shows that they were not composited, based upon the

14   multiple planes of images, everything, the shadows, the movement

15   of skin, the multiple areas that would have to be changed and

16   changed perfectly.  So it's not a question of subjective, meaning

17   I'm just giving an opinion -- shot an opinion out.  This opinion

18   is based upon the evidence that I've looked at.  And there is no

19   evidence that's been shown to me that would compel me to say that

20   they are composited.

21          If you could show me the source material, if you could

22   show me -- which would solve the problem, by the way.  Because

23   you're right.  At that point, then, you know, you have a source

24   material.  This is what we started with.  This is what we ended

25   with.  But that hasn't been shown to me.  Two, hasn't been shown

26   to me that he has the expertise, the software and the hardware to

27   do this work.

28     Q.     So, basically, what you're basically saying is that you

1   knowledge of computer forensics than the average person on the
2   street.

3   Q.   Well, but if you haven't designed a Jaguar and you've
4   never driven a Jaguar and you've never worked on a Jaguar, then
5   you can't talk about a Jaguar?

6   A.   We're not talking about a camera, though.   What we're
7   talking about is the output from the camera, and I am familiar
8   with, by looking at the output, what it would take to make that
9   thing perfect, as perfect as it is right now on the screen.

10          What I'm saying is nothing has been shown to me to --
11   for me to think anything other than those are real and not
12   composited.   If you can show me the source material, if you can
13   show me the equipment that he used that has the power and the
14   software that he used to do the work, and that he's had the
15   technical expertise or training and that he had the time, that's
16   different.   But none of that's been shown to me.

17          All I've been shown, given, is a set of videos, and
18   when you look at the videos, I know what it would take to make
19   those.   It would be extremely hard -- not a little bit hard,
20   extremely hard -- and I don't see any evidence that those were
21   composited or painted.

22   Q.   Well, you say you know what it would take to make those
23   videos, but you don't know what kind of camera was used to make
24   that video; correct?

25   A.   No.   But I don't -- again, I'm looking at the output
26   from it, and I know what it would take to do it.   It takes more
27   than just a camera, by the way.   It takes a lot more than just
28   cameras, because what you're talking about is the filming process,

1    go on record with that, that that's your opinion, that it's --

2         A.    Based upon the data set that I have been given and

3    looked at, there is nothing in this data set that shows me that

4    this was a composited image.  If you can present me source

5    material, that's different.  Now you have some data that changes

6    the possibility.

7         Q.    But for you to say that, you must be thinking in your

8    mind that there is source material that would make it possible;

9    correct?

10        A.    Is it possible for these to be painted and done?  With,

11   again, having the proper equipment, time, expertise and source

12   material -- hardware, software, source material, expertise and

13   time, it could be done.

14        Q.    Okay.  And you don't know that Mr. Whitmore didn't have

15   all of those?

16        A.    What -- again what I said was --

17        Q.    Agreed?  You don't know that Mr. --

18        A.    No, I don't know that.  All I know is what was given to

19   me --

20        Q.    Okay.

21        A.    -- which is the videos and the report.

22        MR. ROBERTS:  May I have just a second, your Honor?

23        THE COURT:  You may.

24             (Brief pause.)

25   BY MR. ROBERTS:

26        Q.    I guess I'm not clear on how you arrived at your

27   statistical probability that it's nearly 100 percent probable that

28   Mr. Whitmore could not have electronically drawn on the suck1,

E X H I B I T      H

1        Q.     Okay.   Which means that a hacker could have had access
2   to this; correct?
3        MR. DORT:   Objection.   Vague as --
4        THE WITNESS:   Are we talking about aliens, again, or --
5   BY MR. ROBERTS:
6        Q.     No.   Well, let's talk -- do you know what I mean -- no.
7   I've never been talking about aliens, sir.   I don't think any of
8   my questions have dealt with aliens.
9        A.     In my line of work, often it's very hard to exclude
10  something --
11       Q.     Okay.
12       A.     -- for sure.   That's why we have the 99.999, because
13  there always has to be that little space left.   But we can -- we
14  can show that it is very unlikely that it happened.
15       Q.     Okay.   Well, the -- what we're looking the ICQ -- the
16  part of the computer -- the part of the memory of the hard drive
17  that saved this data was accessible -- could have been accessible
18  to a third person who is hacking into Eggert Jensen's computer;
19  correct?
20       MR. DORT:   Objection.   Prior ruling.
21       THE COURT:   Overruled that ground.
22  BY MR. ROBERTS:
23       Q.     Do you know what I mean when I say "hacking"?
24       A.     Yes.
25       Q.     Okay.   Tell the jury what you mean -- what you think I
26  mean when I say "hacking."
27       A.     I'm going to tell what you think?
28       Q.     Well, what does -- when I -- when you hear the term

2451

Johnson
Nov 16, 2005

1   A.   I think that's a pretty fair statement to say.

2   Q.   I mean, you can change the name on a registry, for

3   example; right?

4   A.   You can change the name on registry entries, yes.

5   Q.   You can change -- I mean, you could change the file

6   creation date to be whatever you want it to be; right?

7   A.   Yeah.   Within certain limitations imposed by the

8   interpretation of that date.

9   Q.   Okay.   But any of the things that you -- I mean, even

10  the time on the computer can be changed; right?

11  A.   That's correct.

12  Q.   Okay.   So you could have the computer time be any time

13  of the day you want it to be; right?

14  A.   That's correct.

15  Q.   So that if it's 9:00 o'clock in the morning, you can

16  have it your computer show that's 10:00 o'clock at night?

17  A.   That's correct.

18  Q.   Okay.   And your computer will just change every hour

19  and be off by that many hours, 24 hours a day; right?

20  A.   That's correct.

21  Q.   Okay.   So when you're doing your detective work and

22  you're saying that there's such and such a file name on this and

23  such and such is indicated in the metadata, that's all just -- all

24  you're able to say is what you're reading on the computer; right?

25  A.   That's correct, yeah.

26  Q.   You have no idea whether it's really true.   It's just

27  what somebody put there?

28  MR. DORT:   Objection.   Misstates evidence.

1          THE COURT:  Overruled.

2                    You may answer the question.

3          THE WITNESS:  It's -- in the sense that, you know, we have to

4     rely on what's there, but we take that in terms of other

5     consistency.  You know, is it a reasonable date?  Is the date and

6     time accurate or correspond on the computer that it came off of?

7     Now, certainly the date and time can be changed on the computer.

8     You can move it forward, move it back.  But you want to look at,

9     say -- if you're concerned about the date and time of a file, then

10    you would want to look at that in relation to other ones, other

11    files that are on the system and see if that's consistent before

12    you make a value judgment on whether that's a reasonable date for

13    that file or not.

14    BY MR. ROBERTS:

15         Q.    But all you're able to do is say that it's a reasonable

16    date?

17         A.    Yes.  That's all we can do.

18         Q.    Okay.  I mean, this is really not -- it's -- it's not

19    like a fingerprint?

20         A.    Right.  It's not a DNA-type sample in terms of

21    probability.  It's a value judgment knowing that these items can

22    be changed, but it's a value judgment that seems a reasonable date

23    that this occurred.

24         Q.    Okay.  And it becomes part of your operating

25    assumption, as you move onward in your forensic analysis?

26         A.    Certainly.

27         Q.    Okay.  And you just sort of accept as true certain

28    things that you find as you go along the way?

1    A.    Well, I wouldn't say "accept as true." You always know

2    that there's the fact that this has changed or can be changed,

3    so -- I mean, in the sense you accept its trueness to a certain

4    degree.

5    Q.    All right. Now, I think you were asked about -- this

6    would be -- were you asked about People's 168 yesterday? Do you

7    have it up there?

8    MR. DORT: Should be right there.

9    BY MR. ROBERTS:

10   Q.    Here's 168.

11   A.    Thank you.

12   Q.    I think you were asked some questions about that

13   yesterday?

14   A.    Yes, I was.

15   Q.    Okay. And you were asked something about -- let's see.

16   Going into that exhibit, were you asked about bookmarks? I'm

17   trying to remember. Page 1 of 21 is after the photographs.

18   A.    Okay. In the page entitled "Bookmarks."

19   Q.    Yeah, were you asked about that yesterday?

20   A.    Yes, I was.

21   Q.    Now, bookmarks are what? What are bookmarks?

22   A.    Oh, I'm sorry. Didn't realize that was the question.

23         A bookmark is a reference that you would use to make

24   something more readily accessible. It comes from bookmarking

25   pages in a book. So in this case it's used -- the term is used

26   to -- as -- used as a term to describe a collection of links or

27   hyperlinks to Web pages or Web sites.

28   Q.    Okay. And so you click on that hyperlink and it gets

E X H I B I T     I

1    is -- based on my knowledge of his expertise, he is qualified to

2    testify.

3        THE COURT:   If both parties are stipulating that he is an

4    expert, I will accept that stipulation.

5        And, Mr. Roberts, you may ask your last question.

6    BY MR. ROBERTS:

7        Q.    You would agree, would you not, that the only person

8    who could tell you whether the FTP log was or not was the person

9    who was operating the computer; correct?

10       A.    Nope.   Because there are times when an FTP log can be

11   off and he wouldn't know it if someone else turned it off and he

12   thought he had it on.   Or if he had turned it off before and

13   forgot to turn it back on and he thought it was on.

14       Q.    But wouldn't you agree that if the individual in

15   question, the Danish suspect here, was the only person who had

16   control over his computer, no one else but him is going to turn it

17   on or off; correct?

18       A.    No, not necessarily that, even.   He could have any

19   number of ways for the log to have been automatically -- either

20   intentionally or unintentionally -- turned on or off.   So I can't

21   stipulate to that -- I mean, say that.

22       Q.    You seem to be very insistent in that position.   Is

23   there some reason why you're insistent in that position?

24       A.    Excuse me.   I guess it's -- I'm comfortable with the

25   space that I'm in, and I know from past experience and use that

26   there are times when stuff cannot work, when you think you've left

27   something on which has been turned off or someone else has turned

28   it off, or for some reason, because of the multiple modes of

1   failure that can happen within the computer, something can get

2   turned off and you're not familiar -- didn't know that it was

3   turned off.  So to sit there and say that they would know that it

4   was on, the only evidence to that would be if you had the actual

5   log showing that it was on.

6           I don't know how else to explain it, you know.  Unless

7   you had the log itself showing that it was on, you can't say that

8   it was on -- that it wasn't on.  It can be turned off without them

9   knowing it.  That can occur.

10      Q.    Have you looked at any of the briefs that I've filed in

11  this case?

12      A.    No.

13      Q.    Okay.

14      A.    The only thing I've looked at is the videos, the

15  material he provided to me this morning, which is the RCFL report,

16  and then I had a general case overview I saw in Clovis, which is

17  all the names and the stuff regarding Mr. Boobar, which was a

18  different case.

19      Q.    All right.  Yeah.

20      A.    And even that wasn't really the detailed forensic

21  information.  It was just generally what they had done.

22      Q.    Now, you've been retained by the prosecution in this

23  case.  You're retained, but you consult and testify for private

24  companies, as well?

25      A.    Yes, both.  For private companies, as well.

26      Q.    Okay.  Have you testified for other District Attorney

27  offices?

28      A.    Yes, I have.  Both defense and for prosecution.

E X H I B I T     J

**People v. Paul Gordon Whitmore**
Vol. 14

November 2, 2005: Honorable Gale E. Kaneshiro, Dept. 40
**Appearances**
**People**: Jeffrey A. Dort
**People's Witnesses:** Michael Casida
**Paul Whitmore**: Gary Roberts
**John Fielding**, for Lloyd Emmerson, a potential witness
Defendant present.

**Proceedings**:
(Outside presence of jury)  John Fielding took on Emmerson as a client.  p. 1213.
Roberts objected to Underbjerg yesterday blurting out that two European suspects had received mild sentences, which would solidify in the jurors' minds the idea that molesters get "slaps on the wrists".  Moved to preinstruct jurors on the penalties themselves or that the penalties are much more serious than a wrist-slap.  If those instructions are not heard, Roberts moved for a mistrial.  p. 1214-6.
Court denied motions, because jury understood that the trials occurred outside the US and that one man was serving six consecutive life sentences.  p. 1216-7.
Roberts asked Court to instruct Dort that his witnesses are not be blurting out the sentences of others in the case; Court said US peace officers would not be doing that.  p. 1217-8.
Whitmore had almost been put in Emmerson's cell again, Court asked for posted notice that Whitmore and Emmerson be not put in the same cell.  p. 1218-20.
Jury brought in, People called Casida back to stand.  p. 1220.
**Redirect Examination**:  Casida said he'd created an internal labeling system for the CDs, although many of them were reexamined so as to identify victims.  The CDs were mostly pictures; there were some with mixed media.  p. 1221-2.
Casida said that by going over all Emmerson's CDs, he'd learned much about him as a person.  He'd also figured out Emmerson's archiving process, which was useful in getting leads for abused children.  p. 1222-4.
Casida described Emmerson's archiving process.  Emmerson burned media onto CDs, organized by sender or content, in order to save hard drive space.  Roberts objected on hearsay grounds, was overruled.  Casida said it was common sense, and Whitmore had informed him that the reason was as such.  p. 1225-8.
Casida said Emmerson had saved email texts and burned them along with any accompanying photos.  Casida said the emails were often either Lolita site passwords or incriminating statements, but Emmerson was "an extreme packrat".  p. 1229-30.
Casida said Emmerson had often burned duplicate files by mistake or because he'd received and retrieved them more than once.  p. 1231.
Casida said he'd discovered Emmerson's porn network through going over the data many times.  Casida did not describe how Whitmore's name had been uncovered on hearsay grounds.  p. 1232-4.

**People v. Paul Gordon Whitmore**
Vol. 14

November 2, 2005: Honorable Gale E. Kaneshiro, Dept. 40
**Appearances**
**People:** Jeffrey A. Dort
**People's Witnesses:** Michael Casida
**Paul Whitmore:** Gary Roberts
**John Fielding**, for Lloyd Emmerson, a potential witness
Defendant present.

**Proceedings:**
(Outside presence of jury) John Fielding took on Emmerson as a client. p. 1213.
Roberts objected to Underbjerg yesterday blurting out that two European suspects had
received mild sentences, which would solidify in the jurors' minds the idea that molesters
get "slaps on the wrists". Moved to preinstruct jurors on the penalties themselves or that
the penalties are much more serious than a wrist-slap. If those instructions are not heard,
Roberts moved for a mistrial. p. 1214-6.
Court denied motions, because jury understood that the trials occurred outside the US and
that one man was serving six consecutive life sentences. p. 1216-7.
Roberts asked Court to instruct Dort that his witnesses are not be blurting out the
sentences of others in the case; Court said US peace officers would not be doing that. p.
1217-8.
Whitmore had almost been put in Emmerson's cell again, Court asked for posted notice
that Whitmore and Emmerson be not put in the same cell. p. 1218-20.
Jury brought in, People called Casida back to stand. p. 1220.
**Redirect Examination:** Casida said he'd created an internal labeling system for the
CDs, although many of them were reexamined so as to identify victims. The CDs were
mostly pictures; there were some with mixed media. p. 1221-2.
Casida said that by going over all Emmerson's CDs, he'd learned much about him as a
person. He'd also figured out Emmerson's archiving process, which was useful in
getting leads for abused children. p. 1222-4.
Casida described Emmerson's archiving process. Emmerson burned media onto CDs,
organized by sender or content, in order to save hard drive space. Roberts objected on
hearsay grounds, was overruled. Casida said it was common sense, and Whitmore had
informed him that the reason was as such. p. 1225-8.
Casida said Emmerson had saved email texts and burned them along with any
accompanying photos. Casida said the emails were often either Lolita site passwords or
incriminating statements, but Emmerson was "an extreme packrat". p. 1229-30.
Casida said Emmerson had often burned duplicate files by mistake or because he'd
received and retrieved them more than once. p. 1231.
Casida said he'd discovered Emmerson's porn network through going over the data many
times. Casida did not describe how Whitmore's name had been uncovered on hearsay
grounds. p. 1232-4.

E X H I B I T      K

1    BONNIE DUMANIS
     District Attorney
2    JEFFREY A. DORT, SBN 149295
     Deputy District Attorney
3    San Diego Hall of Justice,
     330 West Broadway, Suite 1220
4    San Diego, California 92101
     (619) 531-4295
5

6    Attorneys for Plaintiff

7

F I L E D

Clerk of the Superior Court

SEP 3 0 2005

By: F. McCurley, Deputy

8                SUPERIOR COURT OF THE STATE OF CALIFORNIA

9                       FOR THE COUNTY OF SAN DIEGO

10                            CENTRAL DIVISION

11   THE PEOPLE OF THE STATE OF CALIFORNIA,       CT No.  SCD 165314
                                                  DA No.  AAQ272
12                                   Plaintiff,
                                                  **IN LIMINE MOTIONS – Response**
13                    v.                          1) **Limit "hacking" defense**
                                                  2) **Request for 1041 in camera hearing**
14   PAUL WHITMORE and                            3) **No opposition to exclusion of "Van**
15   BROOKE ROWLAND                                  **Dam" murder investigation**
                                                  4) **People request a PC § 859.1 hearing**
16                                   Defendants.     **re: closure of court during minors**
                                                     **testimony**
17

18                                                Date:    October 5, 6 and 7
19                                                Time:    9:00
                                                  Estimate: 2 days
20                                                Witnesses: 1
                                                  Dept.: 40
21

22

23       Comes now the plaintiff, the People of the State of California, by and through its attor-

24   neys, BONNIE DUMANIS, District Attorney, JEFFREY DORT, Deputy District Attorney, and respect-

25   fully submits the following In Limine Motions.

26                    INDEX OF ARGUMENTS

27   I     The "hacking" defense fails to meet <u>Hall</u> standard for admissibility.........p.2
     II    In camera hearing requested pursuant to Evidence Code § 1041 ............p.6
28   III   Defense motion to exclude mention of "Van Dam" not opposed.............p.6
     IV    People request the court hold a PC § 859.1 hearing re: closure of court.....p.6

                          People's In Limine Motion - Response

                                       1

I.

## THE DEFENSE MAY NOT INTRODUCE
## BIZARRE DEFENSE THROUGH CROSS-EXAMINATION[1]

There are many ways a case may be defended; however, case law has limited the way in

which criminal defendants may claim the SODDI (Some Other Dude Did It) defense. The

limitations that exist regarding third-party culpability prohibit the defense from raising the issue at

any point during trial unless there is a factual connection with a third party capable of raising a

reasonable doubt in the jury's mind. Case law requires that unless there is some factual connection

that this claimed third person has with the crime charged, the evidence is to be excluded. (People

v. Hall (1986) 41 Cal.3d 826.)

An example occurred in People v. Shilling (1987) 188 Cal.App.3d 1201, where the

defendant was charged with murder. The prosecution called Poindexter, the victim's boyfriend, as

a witness. On cross-examination, the defense attempted to pursue a line of questioning designed to

elicit evidence that Poindexter had killed the victim because he was unhappy with the victim's

occupation. The defense further theorized that because Poindexter had killed the victim he now

had an interest in the outcome of the trial and a bias in his testimony. The trial court rejected the

defense theory as "absolutely sheer speculation" and ruled that in the absence of any evidence to

substantiate the theory, the defendant would be precluded from pursuing it. (Id., at p. 1032.)

In upholding the trial court's ruling, the appellate court stated:

---

[1] This topic has been covered in a prior motion filed by the People (See In Limine titled "Third Party Culpability defense requires 402" filed 9/20/05.) However, in light of the defense filing a 1538.5 and admissions by counsel that each plan on presenting their case through "cross" of the People's witnesses, it appeared prudent to file this motion.

"The constitutional right to confront and cross-examine adverse witnesses does not include the right to ask wholly speculative questions ungrounded in factual predicate even when posed in the quest to discredit a witness. In the absence of any evidence supporting defendant's speculative theory that Poindexter killed Houston, we cannot conclude that the trial court abused its discretion in limiting defense counsel's cross-examination of Poindexter." (Id., at p. 1033.)

Thus, the exclusion of third-party culpability evidence is not limited to evidence proffered in the defendant's case. It also includes evidence proffered by way of cross-examination of prosecution witnesses during the prosecutor's case-in-chief. (People v. Pride (1992) 3 Cal.4th 195, 238.)

## A) A Marginal Amount Of Circumstantial Evidence Linking A Third Party To the Crime Is Not Sufficient To Trigger Admissibility Under *Hall.*

The mere presence of direct or circumstantial evidence possibly linking some third party to the crime for which the defendant is charged does not render such evidence automatically admissible. As the California Supreme Court made clear in *Hall* such evidence must be capable of raising a reasonable doubt as to a defendant's guilt. Thus, the courts have consistently upheld cases disallowing such evidence even where the defense has proffered some amount of circumstantial evidence to support a theory that someone other than the defendant perpetrated the crime.

For example, in People v. Von Villas (1992) 10 Cal.App.4th 201, two defendants were charged with the robbery of a jewelry store. At trial, one defendant attempted to introduce the testimony of eyewitnesses to a different jewelry store robbery. The eyewitnesses would have testified that the descriptions of the persons who committed the other robbery matched the descriptions of the persons involved in the present robbery. The defense, in arguing for admissibility, also noted that both robberies took place in jewelry stores in the same geographic location. However, there were also substantial differences between the modus operandi of the two crimes. The trial court held the testimony inadmissible as not rising to the level necessary to create a reasonable doubt as to the defendants' guilt. The appellate court affirmed, stating:

"The tenuous pieces of evidence that purportedly link both robberies do not

meet the standard of reasonable doubt set forth in *People* v. *Hall*, *supra*. **There must be direct or circumstantial evidence which links a third person to the actual perpetration of the crime."** (*Id.*, 10 Cal.App.4th at p. 266.) (emphasis added)

## B)  The defense lacks the "link" required under *Hall*.

At bar, the defense has offered various theories as to how the defendant was "hacked", including the following theories posited in the latest motions filed by the defense in "Motion of Defendant Whitmore to Suppress Evidence – Round Two."

1) "Law enforcement, possibly the Danish National Police or persons acting as agents for law enforcement, sometime during or after Thanksgiving, 2001" hacked (or otherwise) illegally entered Whitmore's computer. (see page 2 of above cited defense motion)

2) Bradley Willman, a Canadian citizen who "hacked 2000-3000" computers and was involved in the case of US v. Kline hacked Whitmore's computer. (See p. 7)

3) "Someone" hacked into my computer – Defendant's statement (see p. 8)

The people seek to exclude evidence that others may have hacked into the defendant's computer unless there is some evidence of this as required under Hall.  The defense should be precluded from floating unsubstantiated theories of possible hacking if there is nothing more.

## C) Hearing only required IF there is a showing that more evidence of third party culpability exists

The seminal case in this area is People v. Hall as cited above, and the line of cases since then has not varied the rule of law. In People v. Kaurish (1990) 52 Cal.3d 648 the California Supreme Court reviewed the cases and set forth what is required. In *Kaurish* the defense wanted to introduce evidence of another killer because this other person said he would "get even" with the victim's family two months before the victim was killed.  The trial court decided against allowing

the evidence because it was too far fetched and violated multiple evidence sections. Specifically, the California Supreme Court stated:

> [T]he standard for admitting evidence of third party culpability was the same as for other exculpatory evidence: the evidence had to be relevant under Evidence Code section 350, and its probative value could not be "substantially outweighed by the risk of undue delay, prejudice, or confusion" under Evidence Code section 352. (*Hall* at p. 834.) In addition to articulating a general standard in *Hall*, we formulated more specific guidelines to judge admissibility of evidence of third party culpability: the rule does not require "that any evidence, however remote, must be admitted to show a third party's possible culpability .... [E]vidence of mere motive or opportunity to commit the crime in another person, without more, will not suffice to raise a reasonable doubt about a defendant's guilt: there must be direct or circumstantial evidence linking the third person to the actual perpetration of the crime." (*Id.* at p. 833; emphasis added) (Kaurish at p. 685; Cert. denied: Kaurish v. CA (1991) 502 U.S. 837.)

The "hacking" defense as proffered by the defense CANNOT raise a reasonable doubt as to the defendant's guilt because Defendant Whitmore is in multiple videos and pictures with his daughter. It does not make any sense, and therefore it is not reasonable to conclude that someone breaking into a computer would be able to manufacture videos and pictures filmed in the Whitmore house and featuring members of the Whitmore family, and then send them around the world. Therefore, this defense fails to make any sense whatsoever, and more importantly fails threshold test as set forth by Hall and should be prohibited from being used at trial.

For all of the foregoing reasons, the People respectfully request that the defendant should be absolutely precluded from (1) offering any extrinsic evidence at trial regarding a theoretical third-party culprit, (2) cross-examining any prosecution witness in such a manner as to suggest third-party culpability and (3) arguing to the jury, whether in voir dire, opening statement, or closing argument, the existence of a potential third-party culprit.

## II

## PEOPLE REQUEST IN CAMERA HEARING

The People are requesting an in camera hearing regarding information that is privileged under Evidence Code § 1041(a). When the prosecution requests an in camera hearing, the court must conduct it outside the presence of the defendant and defense counsel. (*People v. Reel* (1979) 100 Cal.App.3d 415, 420; *People v. Aguilera* (1976) 61 Cal.App.3d 863.)

## III

## DEFENSE MOTION TO EXCLUDE MENTION OF VAN DAM MURDER INVESTIGATION NOT OPPOSED

The People agree with this defense motion.

## IV

## PEOPLE REQUEST THE COURT CONDUCT A HEARING RELATED TO CLOSING THE COURTROOM DURING MINOR'S TESTIMONY AS SET FORTH IN PENAL CODE § 859.1

The People request this motion in light of the information supplied by the Guardian ad Litem representing minors in this case.

## CONCLUSION

The People respectfully ask the court to consider the issues outlined above and to grant the People's In Limine Motions.

**Dated**: September 30, 2005

Respectfully submitted:

BONNIE DUMANIS
District Attorney

By: _____

JEFFREY A. DORT
Deputy District Attorney

People's In Limine Motion - Response

E X H I B I T     L

1   "hacking," does that mean something to you?

2        A.     Yes.

3        Q.     What does it mean?

4        A.     It mean unauthorized access to a computer.

5        Q.     Okay.

6        A.     For example, if you want to deface a Web site or

7   something, you hack yourself into this computer and say, "Kilroy

8   was here" or something like that.

9        Q.     Okay.  And it's possible -- if the data on a hard drive

10  is not encrypted, it's possible for a hacker to go in and get

11  access to that data; correct?

12       A.     I can't exclude it.

13       Q.     Okay.  And it would even be possible for a hacker to

14  rewrite the words that are -- that are on the chat, isn't it?

15       A.     That is 99.99999 percent unlikely to happen, yes.

16       Q.     Well, but let's say they were talking about somebody

17  named Zyklon in this text.  They kept talking about Zyklon and

18  they except saying, "Gee.  We wish -- we don't have Zyklon's IP

19  is.  There some way we can figure out who this guy is"?

20       A.     Uh-huh.

21       Q.     It could have been somebody like Zyklon, for example,

22  to get access to this?

23            THE COURT:  Excuse me.  I'd like to see both counsel sidebar,

24  on the record.

25            (Chambers conference reported:)

26            THE COURT:  Counsel, I want to bring you back at sidebar to

27  address the issue.

28            The Court overruled Mr. Dort's last objection with

1    respect to hacking.  However, the Court sees this as possibly

2    going into third-party culpability.

3         The Court had also ruled that you could not raise

4    third-party culpability.  I overruled the objection when it was

5    hacking, because the Court had made rulings into hacking into

6    Mr. Whitmore's computer, not Eggert Jensen's computer.  However,

7    now you appear to be going into third-party culpability, which is

8    a totally different issue.  And the Court had ruled that hacking

9    cannot -- third-party culpability could not be raised unless there

10   is evidence of that.

11        MR. ROBERTS:  Well --

12        THE COURT:  And unless there was a 402 hearing prior to that

13   issue being raised.

14        MR. ROBERTS:  I had recalled the Court's ruling as having to

15   do with Mr. Whitmore, and what immediately triggered was the

16   morning testimony, when it came out that the witness had actually

17   stitched together a lot of different chats into one exhibit.  And

18   then it occurred to me over the lunch hour that probably this was

19   like a text document.  And I already knew, from prior testimony,

20   that the ICQ chat was not part of the encrypted, and then I

21   remembered the discussion about Zyklon.  And the thought occurred

22   to me that somebody could have -- I mean, this is -- anybody could

23   manipulate this, and so I knew they had this -- they had this guy

24   Zyklon out there that they've been talking about as a

25   troublemaker, in quotes, a troublemaker for people like Whitmore

26   and Eggert Jensen.  They saw him as a troublemaker.

27        THE COURT:  And it appeared from that chat in 85 that he was

28   a so-called troublemaker because he's posting their pictures on

1    unauthorized Web sites, not that he's hacking into their

2    computers.  But that's the information I have based upon the

3    evidence I now have.

4              But Mr. Roberts?

5         MR. DORT:  From the chat.

6         THE COURT:  From the chat.

7         MR. ROBERTS:  I don't know -- and the other thing is I didn't

8    recall specifically the Court's in limine ruling having to do so

9    much with third-party culpability as using the word "hacker" on

10   Whitmore's computer.  Obviously, the Court remembers it as the

11   third-party culpability issue.  I didn't remember it that way,

12   because when I was first evolving this issue of hacking, it was in

13   context of my theory that somebody had hacked into Whitmore's

14   computer and stolen certain videos, and it only went to the

15   1538.5.  It was, in my mind, never something that was going to be

16   a trial issue.  It was only a 1538.5 issue.

17             And it wasn't really until this morning, when the

18   testimony started coming back around to how this Exhibit 85 is put

19   together, that suddenly the lights go on in my head and I'm

20   starting to put things together and I'm thinking, gee, if somebody

21   was playing with Eggert Jensen's computer, say, in October, then

22   by the time the cops see it in November.  And if Eggert Jensen --

23             The other thing the witness testified to is that Eggert

24   Jensen would not necessarily have been able to go back and read

25   the chat, say, a day later or two days later.  Zyklon or Mr. X or

26   somebody could have gone in and changed the chats, and Eggert

27   Jensen, because he didn't have the ability to go back in and read

28   what they had talked about the day before, might not know that his

1   computer had been -- that that -- that that log had been tampered

2   with.

3          So somebody could go in and put a bunch of

4   incriminating words in Mat's mouth -- "Mat" meaning Paul

5   Whitmore -- and Eggert Jensen, or put incriminating words in

6   Eggert Jensen's mouth and Eggert Jensen might not have the ability

7   to go back and even realize it's occurred, because according to

8   the witness, at that time you couldn't just call up yesterday's

9   chat and read it.

10          THE COURT:  Okay.  That's why, Counsel, Mr. Dort had raised

11   in his motions *in limine* the hacking issue and the third-party

12   culpability.  These are not related to the 1538.5 motion.  These

13   were pretrial *in limine* motions.

14          MR. ROBERTS:  And frankly --

15          THE COURT:  And, also, additionally, the witness did not say

16   that Mr. Eggert did not have the capability of keeping those

17   chats.  He did not know.  He found them in the drives when he did

18   the forensic examination of the hard drive.  So he's not saying

19   that Eggert Jensen could not have retrieved those.  He said he did

20   not know.

21          And so at this point I'm going to sustain the objection

22   on third-party culpability unless you've got some evidence that

23   there has been third-party culpability.

24          MR. ROBERTS:  No, I don't.  What I've got is -- is just

25   exactly what the Court has seen.  I mean, what I've got is just a

26   working theory.  This was -- this was an in-grown group of people

27   who I think included one or more backstabbers.  There was a sort

28   of a backstabber tinge to this group.  Obviously, took and posted

**E X H I B I T       M**

1     A.    There is a delay, but you feel it like you are doing a

2  conversation like we do now.

3     Q.    It's more like being on a walkie-talkie?

4     A.    Yes.  Some kind.

5     Q.    And as you -- if you and I were on an ICQ chat right

6  now and I was typing these words as opposed to speaking them,

7  would they come almost as fast as I am talking to you, show up on

8  your screen?

9     A.    Yes.  Only the delay of the distance and the speed of

10  the connection, so --

11     Q.    And the ICQ program that you found in the evidence that

12  you were working on, did you find not only the program that

13  enables the chat, but also some chat?

14     A.    Yes.

15     Q.    How is that saved?

16     A.    That was carved off through a script that's a little

17  program within EnCase, and you can run that on the whole evidence

18  file and you can pull out that chat log.

19     Q.    And did you do that?

20     A.    Yes.

21     Q.    On how many different chats?

22     A.    We found, I believe, 88 different chats that Jensen or

23  his wife, Bente, have had with different people, and about ten or

24  12 of them were with international connections, and the rest of

25  them were with other Danish people also into bondage and spanking

26  as the family Jensen were.  But ten or 12 of them were

27  international-related.

28     Q.    On those ten or 12, did any one of those ten or 12

E X H I B I T     N

1   where your buttons are, you can put background on it and that's

2   called a skin.

3       Q.   Like --

4       A.   It was --

5       Q.   Like a screen -- like a screen saver image?

6       A.   Yeah, something like that.  But on this specific

7   program, and one of the -- one of the things that Paul and my

8   suspect were doing was to make skins to ICQ, among other things.

9   And I believe that they -- they made several different kind of

10  pictures, morphing pictures together.

11      Q.   Edited images?

12      A.   Yes.

13      Q.   Okay.  So even though Jeanette and Menolly were never

14  together, they could be -- they were put together in a photograph

15  to look like they were together?

16      A.   As I recall it, yes.

17      Q.   Okay.  Were there other children on that besides

18  Menolly and Jeanette?

19      A.   On whose pictures specifically?  On the whole hard

20  drive of my suspect?

21      Q.   No.  This collage.

22      A.   On this specific one?

23      Q.   Yes.

24      A.   If Menolly was there, I don't believe anybody else was

25  on that specific one.

26      Q.   But I thought you said there was one that had Menolly

27  together with Jeanette?

28      A.   Yeah, as I just recall it from my memory.  I have to

*Photocopy Notes*
*Curtis Johnson*
*Nov 9, 2005.*

1      A.    Okay.

2      Q.    170 is a multipage document; is that correct?

3      A.    That's correct.

4      Q.    Does it contain two separate information -- or files

5    that you created for the case agent in this case?

6      A.    Yes, it does.

7      Q.    The first one is titled what?

8      A.    "Other victims," with a question mark.

9      Q.    And then the second document -- and that's a one-page

10   document?

11     A.    That is one page.

12     Q.    And then the second document has 182 pages, but printed

13   with four pages per page?

14     A.    That's correct.

15     Q.    Starting with the first document, what are those

16   pictures of?  And just describe them for the record for me.

17     A.    The first document contains two pictures of two young

18   girls.  They are composite pictures in that the girls are posed

19   with backgrounds which are constructed, like, lily pad leaves in

20   one, and the girls have butterfly wings on their backs.  The

21   second one, the two girls are posed with two animals, a tiger and

22   a polar bear.

23     Q.    Does it appear to be a real photograph, in the sense

24   that they're standing right next to or on top of a real tiger and

25   a real polar bear?

26     A.    No, they're not.

27     Q.    And that's the composite part, compositing or putting

28   two pictures -- at least two pictures together?

E X H I B I T        O

F I L E D
Clerk of the Superior Court

APR 0 1 2004

By: H. SAENZ, Deputy

rts [SBN 87644]
Attorney at Law
P.O. Box 620321
San Diego, CA 92162
(619) 232-8366
Fax and Voice Message (909) 752-7464

Attorney for Defendant PAUL GORDON WHITMORE

SUPERIOR COURT OF THE STATE OF CALIFORNIA

IN AND FOR THE COUNTY OF SAN DIEGO

| | |
|---|---|
| THE PEOPLE OF THE STATE OF CALIFORNIA, | No. SCD 165314<br>DA No. AAQ272 |
| Plaintiff, | PETITION OF PAUL GORDON WHITMORE FOR ORDER TO SHOW CAUSE IN RE CONTEMPT TO BE DIRECTED TO THE DISTRICT ATTORNEY FOR SAN DIEGO COUNTY(CODE OF CIVIL PROCEDURE 1211); MOTION TO DISMISS THE ACTION WITH PREJUDICE IN THE ALTERNATIVE |
| v. | |
| PAUL GORDON WHITMORE, | |
| and | |
| BROOKE LOCKWOOD ROWLAND, | |
| Defendants. | Date: April 2 3, 2004<br>Time: 3:30 a/p.m.<br>Dept: 37 |

TO THE HON. LAURA HAMMES, JUDGE OF THE SUPERIOR COURT; DEPUTY DISTRICT ATTORNEY JEFFREY DORT, AND THE DISTRICT ATTORNEY FOR SAN DIEGO COUNTY:

**I. Introduction**

This is a petition for order to show cause in re contempt, or , alternatively, motion to dismiss with prejudice, to be directed to and to be served on the District Attorney for San Diego County as representative of the People of the State of California in the instant action. The basis of this petition is the District Attorney's failure to comply with the order of the Hon. Bernard Revak, made on December 23, 2003 in Department 47 of the Superior Court for the State of California, County of San Diego.

Petition of Defendant Whitmore for Order to Show Cause in re Contempt; Motion To Dismiss With Prejudice

## II. Request For Judicial Notice

In lieu of submitting  a declaration under penalty of perjury to  attest to all the material facts, defendant PAUL GORDON WHITMORE, through undersigned counsel, instead requests that this Court take judicial notice of it's files and to take judicial notice of the transcripts which have been prepared and made part of the record in this proceeding. All such material facts as summarized here are contained in said records.

## III. Judge Revak's Factual Finding As to The Scope Of The "Investigative Team"

Judge Revak presided over a preliminary hearing which lasted three full days and two half days. After hearing testimony and reviewing evidence at a preliminary hearing, Judge Revak made a factual finding that "the agencies that were involved in this investigation are all part of the team." (RT 855:4-5[1]) Judge Revak further stated, ". . . anything out of Denmark that you can obtain relative to that investigation, Switzerland, U.S. Customs, I think they're all part of the investigation team. And wasn't there something in South Carolina?" (RT 859: 24-860:1) Defense counsel replied, "There was," "Texas," "And Florida." (RT 860: 2-4)

## IV. Judge Revak's  Order Of December 23, 2003

Judge Revak's order, made to Deputy District Attorney Jeffrey Dort,  directed that "the District Attorney should request from any police agency that was involved in any aspect of this case to make inquiry concerning any police reports[,] any search warrants, any affidavits in response in respect to any search warrants, local, federal, international." (RT 855:10-14)

Judge Revak continued, "I think the District Attorney is obliged to seek out any type of information that may be exculpatory to these defendants, and that would include against Clovis, United States Attorney's Office out of Fresno, the Danish authorities, the Swiss authorities, to make inquiry and request from them any and all reports relative to this

---

[1]Hereinafter, "RT" refers to volume six of the reporter's transcript of the preliminary hearing (on the date of December 23, 2003) unless otherwise indicated.

Petition of  Defendant Whitmore for Order to Show Cause in re Contempt;  Motion To Dismiss With Prejudice

2

1   investigation." (RT 855:17-23)

2          Judge Revak further directed, "I would order that those requests be done in writing

3   and that the request from the District Attorney be lodged with the Court so that we have a

4   record in the file of what the District Attorney has request from these agencies." (RT 855:24-

5   28)

6          Specifically, Judge Revak ordered the District Attorney to make written request of

7   police agencies which are part of the "investigative team" for the following:

8          1. any type of information that may be exculpatory to the two defendants (RT855:18-

9   19) and  any Brady material (RT856:3)

10          2. any search warrants (RT855:12-13; 856:6)

11          3. any affidavits in respect to any search warrants, local, federal, international

12   (RT855:13-14; 856:7)

13          4. any police reports (RT855:12; 856:8)

14          5. all reports relative to this investigation (RT855:23)

15          6. any witness statements involved in any of the jurisdictions that are in any way

16   involved in this case (RT856:8-10)

17          7. any tape recordings of interviews (RT856:16)

18          8. any images, photographs that haven't already been produced dealing with this

19   investigation (RT856:10-11)

20          9. any hard drives or computers that have been obtained, searched (RT856:11-13)

21          10. anything out of Denmark, Switzerland, U.S. Customs   (RT856:26-27) and. all

22   material that pertains to their investigation which led to the turning over to U.S. Customs the

23   information from Denmark and Switzerland which led to the AT&T Broadband request and

24   ultimate search warrants, and Mr. Emmerson  (RT862:22-27)

25          The full text of Judge Revak's order made on December 23, 2003, is found at pages

26   855-863 of the transcript of the preliminary hearing, volume six.

27

28

Petition of  Defendant Whitmore for Order-to Show Cause in re Contempt; Motion To Dismiss With Prejudice

3

**V. Authority Of This Court To Enforce Judge Revak's Order**

In issuing his order, Judge Revak stated, "[I]f they do not comply, then some other judge is going to have to deal with what, if any, legal ramifications flow from the nondisclosure." RT 856:23-25)

Judge Revak further stated, "As I say, some other judge will have to deal with what is the effect of that [any refusal on the part of the "Feds" to "not give you anything" (RT 861:27-28)] on this prosecution." (RT 861:28 - 862:1)

**VI. The District Attorney Is In Material Breach Of Judge Revak's Order**

**A. The District Attorney Has Lodged One Letter With The Court**

According to the Court's file, Deputy District Attorney Jeffrey Dort, on February 18, 2004, lodged with the Court a copy of two-page letter (also dated February 18, 2004) addressed to Detective Mike Casida c/o the Clovis Police Department, to which (or along with which) a copy of the pages of 855-863 of volume six of the preliminary hearing transcript were appended (these are the pages which contain Judge Revak's order). Mr. Dort also faxed said letter and said attached pages of the preliminary hearing to undersigned counsel on February 18, 2004.

There are no documents in the Court's file to indicate that Mr. Dort sent letters or written requests to "United States Attorney's Office out of Fresno, the Danish authorities, the Swiss authorities" (per Judge Revak's order, *supra*), or the other police *agencies* which were and are "involved in this investigation" (per Judge Revak's order, *supra*).

The following list includes the name of other police agencies which were involved in this investigation, and which were thus part of the "investigative team." Each listed police agency was mentioned in Paragraph 15 (pages 5-8) of Declaration of Gary Roberts (volume one of the declaration). The Declaration of Gary Roberts, in three volumes, was filed under seal on October 14, 2003.

The following list makes page references to the discovery wherein the listed police agencies are mentioned (the page references start with the letter "D"). The referenced

1    discovery pages are appended in Exhibit J of Declaration of Gary Roberts (starting in

2    volume one of the declaration and continuing through volume three of the declaration).

3        (1) Bundeskriminalamt (Wiesbaden, Germany), and Police officer Holder Kind re

4    *suspect Michael Tjarks* (D 001647; 001678-1679);

5        (2) Greenville County Sheriff's Department, South Carolina re *suspect John Zill* (D

6    001650; 001697-1699);

7        (3) Palm Beach County Sheriff's Department, Florida re *suspect Michael Harland*

8    (D 001714-1715);

9        (4) Cassia County Sheriff's Department, Idaho, and Detective Rod Gates, re *suspect*

10   *Leslie Peter Bowcut* (D 001644-001649);

11       (5) law enforcement, Kansas City, Kansas re *suspect Althaus* (D001680-001681);

12       (6) law enforcement, Chanute, Kansis re *suspect Craig Davison* (D001680-001681);

13       (7) law enforcement, Reno, Nevada, re *suspect Sean Bradley* (deceased) (D 001808);

14       (8) law enforcement, Longview, Texas, re *suspect Tracey Reynolds* (D 001645)

15       The Danish authorities referred to by Judge Revak are Danish National Police and

16   Detective Inspector Lars Underbjerg re *suspect Eggert Jensen* (D19-22).

17       The Swiss authorities referred to by Judge Revak are the Geneva Police Department,

18   Geneva, Switzerland re *suspect Jean-Michel Cattin* (D 001113; 001172; 001182; 001645;

19   001808).

20       The U.S. Attorney's Office out of Fresno, California, as referred to by Judge Revak,

21   would include U.S. Customs, Cyber Smuggling Center, c/o "Operation Hamlet;" Special

22   Agent Tatum King (coordinator of investigation) (D000014-000022), and "RAIC" and

23   Special Agent Gillam (D001650; 001697-1699).

24       Written requests for information should have been made to all of these agencies with

25   copies of the written requests lodged with this Court.

26

27

28

Petition of Defendant Whitmore for Order to Show Cause in re Contempt;  Motion To Dismiss With Prejudice

**B. The District Attorney's Failure to Lodge Any Additional Letters With The Court Has Made It Impossible For This Court And The Parties To Monitor Compliance With Judge Revak's Order**

Judge Revak ordered the District Attorney to make a request to each police agency in *in writing* and to *lodge the written requests with the court*. (RT 855: 10-28) Judge Revak gave a very specific reason for the requirement that the written requests be lodged with the Court: ". . . [S]o that we have in a record in the file of what the District Attorney has requested from these agencies." (RT 855:26-28)

Clearly, the intent of the requirement was that the Court as well as the parties (the defendants and their lawyers) be able to monitor the District Attorney's compliance with Judge Revak's Court's order.

Because the District Attorney has lodged with the Court one letter to one police agency, it is impossible to determine whether the District Attorney has issued a written request (and the type of written request) to the other police agencies in this case. Thus, if nothing else, the District Attorney is in breach of the portion of the Judge Revak's order which required the District Attorney to lodge a copy of each written request with the Court.

**C. The Letter to The Clovis Police Does Not Request All Of The Items Which Judge Revak Ordered The District Attorney To Request Of Police Agencies**

The District Attorney's written request addressed to the Clovis Police does not request all of the items which Judge Revak ordered the District Attorney to request. If this letter is boilerplate on which all the other written requests are based (assuming the District Attorney has issued written requests to other police agencies), then the District Attorney is in substantial noncompliance with Judge Revak's order.

For instance, Judge Revak ordered the District Attorney to request *any* police reports (RT855:12; 856:8) and *all* reports relative to this investigation (RT855:23)

Instead, the letter to the Clovis Police requested any police reports *that mention Paul Whitmore or Brooke Rowland.*

Judge Revak directed the District Attorney to request *any* search warrants (RT855:12-

1  13; 856:6) and *any* affidavits in respect to any search warrants, local, federal, international
2  (RT855:13-14; 856:7)

3       Instead, the letter to the Clovis Police requested any search warrants and related
4  affidavits *that include information about Paul Whitmore or Brooke Rowland.*

**D. The District Attorney Effectively Told The Police Agencies To Disregard The Written Request(s)**

7       As noted above, Mr. Dort  enclosed a copy of pages 855-863 of volume six of the
8  preliminary hearing transcript (these are the pages which contain Judge Revak's order) with
9  his February 18, 2004 letter to Detective Mike Casida of the Clovis Police Department.
10 (Please see copy of letter and enclose as lodged with this Court.)  The letter stated in a
11 parenthetical comment, on page one, "Attached is a the transcript of the order by the
12 Honorable Judge Revak . . .") Presumably, Mr. Dort enclosed a copy of the transcript with
13 each written request.

14      The problem is this: The transcript contains comments  by Judge Revak which
15 question the enforceability of his order.  By enclosing the transcript with each written
16 request, the District Attorney shared those comments with the recipient, and, thus,
17 effectively told each recipient to disregard the request.

18      In the transcript, Judge Revak stated, with respect to the U.S. Attorney's Office, "I
19 should tell you that having worked in the U.S. Attorney's office at one  time, I don't know
20 that they have to turn over anything . . ." (RT 856:25-28)

21      In response to a comment by Mr. Dort,  "I may get zero hard drives, I may get ten
22 hard drives," (RT 861:21-22), Judge Revak said, "I understand that. I understand that. I
23 cautioned all of you that you may get nothing from these agencies." (RT 861:23-25)

24      Judge Revak further stated, "I suspect that the Feds will not give you anything." (RT
25 861: 27-28)

26      In response to a further comment by Mr. Dort, "I will attempt to comply with the
27 court, but I'm just warning you that I don't know what I'm going to get," (RT: 862:14-16),

28

1  Judge Revak said, "I don't either. That's one of the problems with this type of case is that

2  , you know, it crosses not only st ate lines, but international lines, and that's how this case

3  got going is from Denmark. [Paragraph] So all I want you to do is make inquiry . . . If they

4  say no, then we'll cross that bridge with we get to it." (RT 862: 17 - 863: 1).

5  **E. To Date, No Additional Discovery Had Been Provided To The Defense**

6  Undersigned counsel has not received any additional discovery from the District

7  Attorneys' Office since the preliminary hearing, in December, 2003.

8  **VII. Requested Sanction: Dismissal Of This Action With Prejudice**

9  Ordinarily, contempt of court is punishable by jail or fine. However, in this case, the

10  Court has other remedies which are equally effective if not more effective in redressing the

11  wrong done to the authority of the Court. A very appropriate and  effective remedy would

12  be the dismissal of this action *with prejudice*.

13  The District Attorney's Office has been on notice since February 5, 2002 of the

14  seriousness with which defendant WHITMORE, through undersigned counsel, takes the

15  District Attorney's discovery obligations in the instant case. (See February 5, 2002 dated

16  written discovery request served  District Attorney by undersigned counsel, Decl. of Gary

17  Roberts, filed October 14, 2003, Paragraph 2, Exhibit A.) Defendant WHITMORE, through

18  undersigned counsel, continued to serve on the District Attorney written requests for

19  discovery from and after February 5, 2002 through October 15, 2002. (Decl. of Gary

20  Roberts, filed October 14, 2003, Paragraphs 2 - 7, Exhibits A - F)

21  Thereafter, on October 14, 2003, defendant WHITMORE, through undersigned

22  counsel, filed a motion to compel discovery. A hearing on the motion was set for November

23  4, 2003.  The motion was heard by the Hon. Howard  Shore. Judge Shore deferred further

24  ruling on the motion to the judge assigned to hear the preliminary hearing, and in the

25  meantime denied the motion without prejudice.

26  On December 22, 2003, defendant WHITMORE, through undersigned counsel, filed

27  a second  motion to compel discovery. The motion was heard the following day by the Hon.

28

1    Bernard Revak, the judge presiding at the preliminary hearing. Judge Revak made the

2    discovery orders which are now the subject of the instant petition.

3        Thus, under no circumstances can the District Attorney claim to be caught unaware

4    of the gravity to which defendant WHITMORE, through undersigned counsel, assigns the

5    District Attorney's current breach of Judge Revak's order. Defendant WHITMORE, through

6    undersigned counsel, has patiently and meticulously attempted to obtain the District

7    Attorney's voluntary cooperation with it's discovery obligations, all to little or no avail.

8    Thus, the time has come to lay the hammer down hard on the District Attorney. Dismissal

9    with prejudice is the appropriate contempt sanction to impose.

10       Under Penal Code section 1054.5(c), governing discovery, the court shall not dismiss

11   a charge unless required to do so by the U.S. Constitution. Consistent with this requirement,

12   courts have held that "Dismissal is proper as a sanction for refusing to comply with a

13   discovery order when the effect of such refusal is to deny defendant's right to due process.

14   (*People v. Broome* (1988) 201 Cal.App.3d 1479, 1497 [247 Cal.Rptr. 854]; *Dell M. v.*

15   *Superior Court* (1977) 70 Cal.App.3d 782, 786 [144 Cal.Rptr. 418].)" (*People v. Brophy*

16   (1992) 5 Cal.App.4th 932, 937.)

17       In the instant case, the District Attorney's failure to comply with Judge Revak's

18   order has denied defendant WHITMORE due process by substantially delaying the

19   discovery process. This case is now over *three months* down the road from the date on

20   which Judge Revak issued his order, yet defendant WHITMORE is no closer to having his

21   discovery rights vindicated than he was when Judge Revak issued the order on December

22   23, 2003.

23   **VIII. The District Attorney's Noncompliance With Judge Revak's Order Is Contempt**
     **Of Court**

24

25       According to Code of Civil Procedure 1209:

26       1209. (a) The following acts or omissions in respect to a court of justice, or

27       proceedings therein, are contempts of the authority of the court:

28

* * *

3. <u>Misbehavior in office, or other willful neglect or violation of duty by an</u> **attorney, counsel**, <u>clerk, sheriff, coroner, or other person, appointed or elected to perform a judicial or ministerial service;</u>

4. <u>Abuse of the process or proceedings of the court</u>, or falsely pretending to act under authority of an order or process of the court;

5. <u>Disobedience of any lawful judgment, order, or process of the court;</u>

* * *

8. <u>Any other unlawful interference with the process or proceedings of a court;</u>

* * *

(Emphasis added)

Contempt of court is a crime under the California Penal Code section 166, which provides that:

(a) Except as provided in subdivisions (b), (c), and (d), every person guilty of any contempt of court, of any of the following kinds, is guilty of a misdemeanor:

* * *

(4) Willful disobedience of the terms as written of any process or court order or out-of-state court order, lawfully issued by any court, including orders pending trial.

* * *

Penal Code section 657 provides that: " A criminal act is not the less punishable as

///
///
///
///

1    a crime because it is also declared to be punishable as a contempt."

2    Date: April 1, 2004                 Respectfully submitted,

3

4

5                             GARY ROBERTS
                            Counsel to Paul Gordon WHITMORE

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### Declaration of Service

I, undersigned, say: I am over 18 years of age, engaged in the practice of law in the County of San Diego, California, and not a party to the subject cause. My business address is P.O. Box 620321, San Diego, CA 92162. On today's date I served PETITION OF PAUL GORDON WHITMORE FOR ORDER TO SHOW CAUSE IN RE CONTEMPT TO BE DIRECTED TO THE DISTRICT ATTORNEY FOR SAN DIEGO COUNTY(CODE OF CIVIL PROCEDURE 1211); MOTION TO DISMISS THE ACTION WITH PREJUDICE IN THE ALTERNATIVE, of which a true and correct copy of the document filed in the cause is affixed, by personal service as follows:

Mr. Jeffrey Dort, Deputy District Attorney
San Diego County District Attorney's Office

in Department 37, Superior Court, 220 West Broadway, San Diego, CA 92010, or

c/o 9th Floor Reception
Hall of Justice, 330 W. Broadway
San Diego, CA 92101

Mr. Albert Arena        (Counsel for BROOKE LOCKWOOD ROWLAND)
Attorney at Law

in Department 37, Superior Court, 220 West Broadway, San Diego, CA 92010, or

110 West "C" Street. Suite 1013
San Diego, CA 92101

I declare under penalty of perjury that the foregoing is true and correct. Executed on April 1,  2004,  at San Diego, California.

E X H I B I T          P

00269

13

1   (

2   P.O. Box 620321
    San Diego, CA 92162
3   (619) 232-8366
    Fax and Voice Message (909) 752-7464

4
    Attorney for Defendant PAUL GORDON  WHITMORE
5

F  I  L  E  D
Clerk of the Superior Court

MAY 2 1 2004

By: J. JACKSON, Deputy

6                 SUPERIOR COURT OF THE STATE OF CALIFORNIA

7                     IN AND FOR THE COUNTY OF SAN DIEGO

8
    THE PEOPLE OF THE STATE OF
9   CALIFORNIA,

                                          No. SCD 165314
                                          DA No. AAQ272

10                          Plaintiff,

11  v.

12  PAUL GORDON WHITMORE,

13  and

14  BROOKE LOCKWOOD ROWLAND,

15                          Defendants.

STATUS OF THE PEOPLE'S
NONCOMPLIANCE WITH
DISCOVERY ORDERS AND
NOTICE OF RENEWED MOTION
OF DEFENDANT PAUL GORDON
TO DISMISS WITH PREJUDICE

Date: May 25, 2004
Time: 4:00 p.m.
Dept: 37

16

17

18  **I. Introduction And Notice Of Renewed Motion To Dismiss With Prejudice**

19          On April 23, 2004, the Court heard a motion to dismiss filed on behalf of defendant

20  PAUL GORDON WHITMORE ["WHITMORE"] predicated upon alleged discovery

21  failures of the People.  The Court denied the motion but issued a discovery order and set a

22  review date for May 6, 2004 at 4:00 p.m. to monitor the People's compliance with the

23  Court's order.

24          On May 6, 2004, the Court deferred the hearing to May 25, 2004 at 4:00 p.m. for the

25  reasons stated by the Court.

26          By this written filing, WHITMORE informs the Court that the People remain in

27  noncompliance with the discovery order made by this Court on April 23, 2004 as well as

28
    People's Noncompliance With Discovery Orders:   WHITMORE's Renewed Motion To  Dismiss With Prejudice

1  Judge Revak's December 23, 2003 discovery order. Accordingly, at the hearing on May 25,
2  2004, WHITMORE will renew his motion for an order to dismiss the charges against
3  WHITMORE with prejudice.

4  **II. Status Of Proceedings In U.S. District Court**

5       WHITMORE has been in custody in Fresno, California as a result of related charges
6  filed there in U.S. District Court. Undersigned counsel is informed   as follows: (1)
7  WHITMORE was scheduled to have a federal probation interview on May 18, 2004. (2)
8  After May 18, 2004, WHITMORE was to be available to be (a) transported to San Diego,
9  California to participate in proceedings in this Court and, (b) to remain in custody in San
10  Diego until the conclusion of any trial in this Court. (3) By agreement between
11  WHITMORE and the United States Attorney in Fresno, (a) any sentence imposed by the
12  U.S. District Court will run concurrently with any sentence out of this Court (the Superior
13  Court) on the instant charges, and (b) WHITMORE will serve any sentence imposed by the
14  U.S. District Court before serving any sentence by this Court (the Superior Court).

15  **III. Discovery Received From The Prosecution By WHITMORE Since December, 2003**
16  **A. Introduction**

17       At the hearing on April 23, 2004 Deputy District Attorney Dort reported to the Court
18  that an additional wave of discovery was made available to WHITMORE on April 15, 2004.
19  (RT 32)[1] On April 19, 2004, undersigned counsel went to the District Attorney's discovery
20  window on the 9th Floor and retrieved discovery pages 2062-2346.[2]

21       It is worth noting what this material contained as well as what it omitted.

22

23

24       [1]Unless otherwise indicated, "RT" refers to the reporter's transcript of proceedings in this
25  Court on April 23, 2004 and May 6, 2004 prepared by court reporter Traci Foster.

26       [2]At the conclusion of the April 23, 2004 hearing, the District Attorney showed undersigned
     counsel some additional photographic images depicting child pornography. Also, at the conclusion
27  of the May 6, 2004 hearing, the District Attorney provided undersigned counsel with a copy of
     discovery letters which he sent to police agencies. The letters are discussed *infra*.
28

People's Noncompliance With Discovery Orders:   WHITMORE's Renewed Motion To Dismiss With Prejudice

2

## B. Ten Additional Pages Of Material From Danish Police

The April 15, 2004 discovery contained thirteen pages of material from the Danish police, discovery pages 2334-2346. Three of these pages (discovery pages 2334, 2335, and 2338) are copies of material provided to the defense in February, 2002 (discovery pages 45, 46, and 47), except that pages 45-47 bear handwriting that does not appear on pages 2335-2335, 2338. This leaves ten additional pages of new discovery from the Danish police (discovery pages 2336-2337, 2339-2346). Three of these pages (2336-2337, 2340) appear to be the balance of a report dated January 17, 2002 which commenced on discovery pages 45 and 46 (discovery pages 2334-2335). One of the pages (discovery page 2339) appears to be the balance of a report also dated January 17, 2002 which commenced on discovery page 47 (discovery page 2338). They consist of a listing of suspects (a listing which commenced on discovery page 47). Two of the new pages appear to be chat logs (or possibly other computer data the significance of which is not immediately apparent to undersigned counsel) labeled "Lloyd" (discovery pages 2341-2342) possibly downloaded from JENSEN's computer. One page (discovery page 2343) appears to be paperwork relating to a "WHOIS" search for an AT&T internet user (possibly Lloyd Emmerson but not WHITMORE). A final three pages (discovery pages 2344, 2345, and 2346) appear to be a print-out of computer data, the significance of which is not immediately apparent to undersigned counsel.

## C. Other Material From Danish Police And Swedish Authorities Is Yet To Be Produced

None of the new material from the Danish police (referred to in the preceding paragraph) contained any new information concerning the genesis of this case in Sweden, or the activity of Danish police from November, 2001 to January 17, 2002. It was during this time period that Danish police gained access to the residence of Eggert and Bente JENSEN, the JENSEN computer(s), and, presumably, statements of Eggert and Bente JENSEN. It was also during this time that WHITMORE was identified by Danish police as

1  a suspect.

2      However, WHITMORE has yet to receive any discovery which discloses

3  methodologies utilized by the Danish police to achieve such access.

4      Moreover, it remains unclear how WHITMORE became known to Danish police as

5  early as January 17, 2002. WHITMORE was referred to by name and by his San Diego

6  street address in a Danish police report dated January 17, 2002. U.S. Customs did not serve

7  their summons on WHITMORE's internet service provider until January 18, 2002 and did

8  not receive a reply from the internet service provider until January 22, 2002.

9      According to a report by Det. Guerra, who interviewed Danish police officer Lars

10  Underbjerg, an envelope bearing WHITMORE's name and return address was found during

11  the search of the JENSEN residence. (Discovery pages 19-20, attached to sealed Decl. of

12  Gary Roberts as part of Exhibit J.).

13      However, the purported discovery of the envelope in JENSEN's residence does not

14  truly explain how WHITMORE first became known to the Danish police. For one thing, the

15  Danish police have thus far failed to provide any proof that this envelope actually exists. For

16  another thing, the investigation of Eggert JENSEN was commencing the very same month

17  (November, 2001) as the investigation of Ronald C. KLINE in Orange County, California.

18  It turns out the investigation of KLINE was predicated on information provided to police by

19  computer hacker Bradley WILLMAN. In the KLINE case, the U.S. District court found that

20  WILLMAN was a police agent, that his entry to KLINE'S computer was unlawful, and that

21  all evidence subsequently obtained directly from KLINE'S computer was suppressed under

22  the Fourth Amendment.

23      WILLMAN admitted that he hacked into 2,000 to 3,000 computers and shared

24  information with, among others, various internet child pornography watchdog groups.

25      Thus, the question: Did WILLMAN (or another hacker) hack WHITMORE's

26  computer? Did WILLMAN (or another hacker) provide information to the Swedish

27  Department of Save The Children or to the Danish police?

28

People's Noncompliance With Discovery Orders:  WHITMORE's Renewed Motion To Dismiss With Prejudice

4

Why is it that since October 15, 2003, when WHITMORE first espoused this theory in his discovery motion filed on that date in the Superior Court, the District Attorney and/or the Danish police have made no effort to deny that such a thing occurred or furnish proof that such did not occur? If the Danish police have nothing to hide, why have they not provided their entire file to the San Diego District Attorney? Their silence is deafening.

It must be kept in mind that at the April 23, 2004 hearing, the Court expressly ordered that this material be produced. The Court in addressing the District Attorney said, "It seems to me that when the DA looks at this case, the first thing that should have occurred to you would be: I've got to get those reports to see how Jensen's computer was gotten into." (RT 32: 23-27) Several pages later, the Court put the question: "How did Jensen's computer get seized by Lars? What legal mechanism did he use to get into Jensen's house to seize his computer and to interview and arrest Jensen? That is the key." (RT 41:20-23)

Several pages hence, the Court ordered, "And posthaste on getting to Denmark to get those reports, and to Sweden . . . In other words, justifying the legality of what was done in Sweden and then to Denmark. How did they arrest Mr. Jensen. . . [RT 43: 20-27] All police reports you would want here if the search had been done here. And let's have an update -- let's have a meeting in two weeks so that we can find out the progress that's been made. [RT 44:1-5]" (RT 43:20 - 44:5)

Several pages later, the Court admonished the prosecution: "[T]his whole case could hinge on whether the information is obtained. And the most significant issue, perhaps, in the case today at this moment, and perhaps forever, will be the 1538.5 motion." (RT 45:26-46:2)

Several pages later, the Court made specific mention of the Swedish Department of Save the Children[3] as an agency from which the District Attorney should be seeking discovery. (RT 54: 9-15) The Court directed the District Attorney to draft the discovery

___

[3]The name "Swedish Department of Save the Children" appears in Det. Guerra's report, discovery page 19, appended to Exhibit J, October 14, 2003-filed sealed Decl. of Gary Roberts.

1  letter to the Swedish authorities "in a way that they understand everything to do with that

2  investigation . . ." (RT 54: 9-15). With respect to the letter which the District Attorney sent

3  to other police agencies, the Court cautioned, "I'm not sure this particular letter would do

4  it." (RT 54: 24-25)

5  **D. Lloyd EMMERSON Search Warrant And Supporting Affidavit**

6      The April 15, 2004 discovery contained one search warrant and supporting affidavit

7  for the search of Lloyd EMMERSON's computer (discovery pages 2150-2158). The defense

8  had been requesting this document since 2002.(October 14, 2003 filed sealed Decl. of Gary

9  Roberts, Exhibit E.)   The defense will be evaluating this document along with other

10 information yet to be received from Denmark and elsewhere to determine the viability of a

11 challenge to the search of EMMERSON's residence and computer and related materials.

12 **E. Other Material From Clovis Police Is Yet To Be Produced**

13     The prosecution has produced little else from the investigation conduced by the

14 Clovis police.   Initial Clovis police reports were provided to WHITMORE by the

15 prosecution in February, 2002 (discovery pages 64-79, attached to October 14, 2003 filed

16 sealed Decl. of Gary Roberts, Exhibit J).

17     At the hearing on April 23, 2004, the court ordered the District Attorney to provide

18 the entire Clovis police file concerning Lloyd EMMERSON to the defense, including any

19 tape recordings of statements by EMMERSON. (RT 59-62). The subject of producing any

20 tape recorded interviews with EMMERSON was addressed in the transcript at RT 59:13-24.

21 The court agreed with WHITMORE's request for any such tape recordings. (RT 54:24)

22 Several pages later, the Court instructed the prosecution as to specific language to insert into

23 a letter to the Clovis police: "I want sever report in your file in connection with Emmerson.

24 Every written report. Forget the computer stuff. Just every written report they have in

25 connection, and that will do it. And report back in two weeks on what they're responded."

26 (RT 62: 21-26) (The subject of any tape recorded interview was addressed in the transcript

27 at RT 59:13-24.)

28

## F. Thirteen Additional Reports From U.S. Customs

The April 15, 2004 discovery contained thirteen multi-page reports generated by the U.S. Customs Service (Department of the Treasury), discovery pages 2062-2149. Much of this material rehashes and summarizes the investigation reports authored by San Diego Sheriff's Detective Stephanie Guerra concerning WHITMORE, Brooke ROWLAND, and Lloyd EMMERSON.

However, there was some new information contained in these reports.

For instance, several reports make reference to a French language Swizz police report provided to U.S. Customs Special Agent Lisa Fairchild by Swiss police officer Pascal Seeger. Apparently, the French language report summarized a post-arrest statement made to Swiss police by suspect, Jean-Michel CATTIN. At the hearing in this Court on April 23, 2004, undersigned counsel requested a copy of this French language report and this Court ordered its production, with the issue of production to be reviewed in two weeks. (RT 65: 3-7)

Also, several reports refer to the conference held March 26-28, 2002 in San Diego which was attended by police officers from Europe, Interpol, and the United States.

Also, one report describes the computers seized from WHITMORE's residence and attempts by computer forensics to open and read the computers. (The attempts were apparently unsuccessful.)

Also, several reports make reference to the criminal activities of Peter BOWCUT (Burley, Idaho), . Ramon PATINO (Houston, Texas), Michael HARLAND (Palm Beach, Florida), John ZILL (Greenville, South Carolina), and Jean-Michel CATTIN (Geneva, Switzerland).

## G. Report Of Children's Hospital Interview With WHITMORE's Two Children

Included in the April 15, 2004 discovery was a report produced by Children's Hospital of an interview with WHITMORE's two children on November 25, 2003. (Discovery pages 2159-2163). This report appears similar to or identical to one that has been

1   previously produced to the defense. WHITMORE had requested this discovery as part of

2   his October 15, 2003 discovery motion, but had not requested it as part of his motion to

3   dismiss filed on April 1, 2004.

## H. Report From Regional Computer Forensics Laboratory

5        The April 15, 2004 discovery contains a report prepared by the Regional Computer

6   Forensics Laboratory (discovery pages 2164-2254). WHITMORE had not requested this

7   material as part of his motion to dismiss filed on April 1, 2004 and thus assumes that the

8   prosecution intended to provide this material to WHIMORE anyway.

## I. Computer Analysis Report From Palm Beach Sheriff's Office

10       The April 15, 2004 discovery contains a lengthy computer Analysis Report from the

11  Palm Beach Sheriff's Office (Discovery pages 2255-2311). The Palm Beach Sheriff's

12  Department investigated suspect Michael HARLAND and is one of the police agencies from

13  which the District Attorney was ordered by Judge Revak to request additional discovery.

14       The problem is that this particular report, while relevant to WHITMORE's case, has

15  nothing to do with the discovery which WHITMORE seeks from the prosecutor or expects

16  the prosecution to obtain from other police agencies. As pointed out by WHITMORE in his

17  April 1, 2004 filed motion to dismiss, page 6-7, as well as his April 21, 2004 filed reply

18  brief, at pages 9-10, the District Attorney's discovery letter -- purportedly prepared in

19  response to Judge Revak's December 23, 2003 discovery order -- did not request all of the

20  items which Judge Revak ordered the District Attorney to request of police agencies.

21       For instance, Judge Revak directed the District Attorney to request *any* search

22  warrants (RT 855:12-13; 856:6,) and *any* affidavits in respect to any search warrants, local,

23  federal, international (RT 855:13-14; 856:7)[1].

24       Instead, the letter to police agencies requested any search warrants and related

25  affidavits *that include information about Paul Whitmore or Brooke Rowland.*

---

[1]Reporter's transcript of preliminary hearing proceedings on December 23, 2003.

1    Thus it stands to reason that the Palm Beach Sheriff's Office did not produce a

2    search warrant or affidavit in response to the District Attorney's discovery letter. The Palm

3    Beach suspect was Michael HARLAND, not WHITMORE and not ROWLAND. It is

4    unlikely that a search warrant (or affidavit in support) directed toward HARLAND would

5    have mentioned WHITMORE or ROWLAND .

6    For example, the search warrant and affidavit prepared by the Clovis police for the

7    residence and computer drives of suspect Lloyd EMMERSON did not mention

8    WHITMORE (search warrant and supporting affidavit, discovery pages 2150-2158). Yet,

9    we know from  communications found inside EMMERSON's computer drives that

10   WHITMORE communicated with EMMERSON that WHITMORE had an expectation that

11   EMMERSON would encrypt his computer data and keep it private. We know also that

12   EMMERSON'S computer drives contained evidence which purportedly incriminates

13   WHITMORE.

14   Thus, WHITMORE again respectfully asks this Court to order the District Attorney

15   to word its discovery letter to police agencies in precisely the language articulated by Judge

16   Revak (cited above), without the qualifiers "that include information about Paul Whitmore

17   or Brooke Rowland." We know that HARLAND's computer drive(s) contained data which

18   purportedly incriminates WHITMORE. In fact, the prosecution presented the evidence at

19   the preliminary hearing. We know also that WHITMORE expected those with whom he

20   communicated through the internet to encrypt their computer data and to protect the privacy

21   of the communications.

22   **J. Discovery Provided By The Cassia County, Idaho  Sheriff**

23   The April 15, 2004 discovery contains material provided by the Cassia  County,

24   Idaho Sheriff. (Discovery pages 2255-2311). The Cassia County Sheriff investigated suspect

25   Leslie Peter BOWCUT and is one of the police agencies from which the District Attorney

26   was ordered by Judge Revak to request additional discovery.

27   The discovery provided by the Cassia County Sheriff in response to the District

28

1   Attorney discovery letter consists of email communications as well as purported hard core

2   child pornography. (The District Attorney, in keeping with past practice, omitted the

3   images of such purported pornography from the materials made available to the defense on

4   April 15, 2004, a practice with which WHITMORE has no objection. WHITMORE does

5   not stand on his right under the holding *Westerfield v. Superior Court* (2002) 99 Cal. App.

6   4th 994 to have such images made available to his attorney. The purported child

7   pornography in this case has not been the focus of any of the discovery motions filed to

8   date.)

9         This is not the discovery which WHITMORE seeks from the prosecutor or expects

10   the prosecution to obtain from other police agencies. The discovery provided by Cassia

11   County suffers the same deficiency as the discovery provided by Palm Beach and for the

12   same reasons (please see discussion under preceding heading, letter I).

13         Again, the Court is respectfully requested to order the District Attorney to word its

14   discovery letter to police agencies in precisely the language articulated by Judge Revak

15   (please see discussion under preceding heading, letter I), without the qualifiers "that include

16   information about Paul Whitmore or Brooke Rowland."

17   **K. Letters To Police Agencies**

18         At the hearing on April 23, 2004, the Court ordered the District Attorney to provide

19   to WHITMORE's counsel every letter that the District Attorney sent to police agencies in

20   response to Judge Revak's order. (RT 27: 26-28; 42: 18-22)

21         On May 6, 2004, the District Attorney provided the defense as well as the Court a

22   copy of correspondence sent by the District Attorney to various agencies. It appears that

23   most of the agencies to which the letter was sent were regional offices of U.S. Customs (now

24   known by the acronym "DHS [Department of Homeland Security]/ICE," along with letters

25   to the Toronto Police, the U.S. Consulate in Toronto, and an office referrfsed to as "Canada

26   Border Services."

27         Apparently, the letter was also sent to the police agencies listed on the six-page chart

28

People's Noncompliance With Discovery Orders: WHITMORE's Renewed Motion To Dismiss With Prejudice

10

002Pq

1  (which accompanied the above mentioned letters) entitled "Rowland/Whitmore Operation

2  Hamlet Listing Updated 5/6/2004." (This six-page chart was also provided to the defense

3  and the Court by the District Attorney on May 6, 2004.)

4        Comparing this list of agencies to the list provided by WHITMORE on page five of

5  WHITMORE's April 1, 2004-filed motion to dismiss, it appears that the letter was <u>not</u> sent

6  to the following agencies which appear on page of five of WHITMORE's April 1, 2004

7  motion:

8        1. Bundeskriminalamt (Wiesbaden, Germany), and Police officer Holder Kind re

9  suspect Michael TJARKS

10       2. Greenville County Sheriff's Department, South Carolina re suspect John ZILL

11       3. aw enforcement, Kansas City, Kansas re suspect ALTHUS

12       4. law enforcement, Chanute, Kansas re suspect Craig DAVISON

13       5. law enforcement, Reno, Nevada, re suspect Sean BRADLEY (deceased)

14       6. law enforcement, Longview, Texas, re suspect Tracey REYNOLDS

15       7. Swedish Department of Save The Children (This agency was not on

16  WHITMORE's list of agencies on page five of the April 1, 2004 filed motion to dismiss.

17  However, on April 23, 2004, the Court directed that a letter to Swedish authorities  be

18  tailored in such a way that the agency understood the scope of the discovery request. [RT

19  54: 9-26])

20       8. As for police in Geneva, Switzerland (suspect Jean-Michel CATTIN), the

21  District Attorney represented in Court on April 23, 2004 that he had intentionally not

22  contacted the Swiss authorities because "I think I can somehow officially mess up the case

23  that way . . . So I have not contacted them to receive those reports except for by an email that

24  -- I believe to notify the department that there's a request coming." (RT 28:21-25)

25       9. As for the Danish police (suspects Eggert and Bente JENSEN), at the hearing on

26  April 23, 2004, the District Attorney quoted from an email which he said he sent to the

27  Danish police. (RT 54-55) The Court replied, "I would  even go broader than that." (RT

28

People's Noncompliance With Discovery Orders;  WHITMORE's Renewed Motion To  Dismiss With Prejudice

11

1    56:9-10) The Court then suggested language which the District Attorney should use. (RT

2    56: 10-15) The Court said, "Let them come back and say, 'Well, you know, there's

3    something we can't give you.'" (RT 56: 15-18)   The defense has not received any

4    notification from the District Attorney that the letter suggested by the Court has been sent

5    to Denmark.

6        10. As for the Clovis police (suspect Lloyd EMMERSON), at the hearing on April

7    23, 2004, the Court suggested specific wording of a letter to be sent to the Clovis police. (RT

8    62: 20-26) to supplement the letter to the Clovis police which was filed with the Court as

9    part of WHITMORE's April 1, 2004-filed motion to dismiss.

10   **L. No Other Discovery Has Been Received From The Prosecution Since April 15, 2004**

11       Two points are important to make here. First, except as outlined and summarized

12   above, no additional discovery has been provided to the defense since April 15, 2004.

13   Second, until April 15, 2004, no discovery has been provided to the defense since the

14   December, 2003.

15       Looking at the discovery made available to WHITMORE on April 15, 2004, it is

16   helpful to get to the root of the matter, and to parse aside the extraneous, unrequested

17   discovery. Doing so demonstrates that since December, 2003, the District Attorney has

18   produced no more than approximately 20 pages of material in response to WHITMORE's

19   discovery requests: (a) the above-mentioned ten additional pages of material from Denmark,

20   and (b) the above-mentioned nine pages of search warrant material from the Clovis police.

21   The reports from U.S. Customs provided some insight to the way the U.S. Customs

22   investigation was conducted. However, the reports do not address the search and seizure

23   issues which are central to WHITMORE'S discovery request.

24   **IV. To Date, The Prosecution Is Not In Substantial Compliance With This Court's
     April 23, 2004 Order**

25

26       At the hearing on April 23, 2004, the Court ordered the prosecution to produce

27   distinct and discrete items of discovery. A list of those items is set forth here. To date, the

28

1 | prosecution has produced none of those items.

2 |     1. *Order*: The Denmark and Sweden materials.  (Please see discussion above,

3 | including citation to court reporter's transcript of April 23, 2004 hearing, under heading "III.

4 | B." and "III. C.")

5 |     *D.A. Response To Date*: Ten additional pages from Denmark. (Please see discussion

6 | above under heading "III. B.")

7 |     2. *Order*: Every letter that the District Attorney sent to police agencies in response

8 | to Judge Revak's order.  (Please see discussion above, including citation to court reporter's

9 | transcript of April 23, 2004 hearing, under heading "III. K.")

10 |     *D.A. Response To Date*: (Please see discussion above, including citation to court

11 | reporter's transcript of April 23, 2004 hearing, under heading "III. K.")

12 |     3. *Order*: Letter to Swedish Department of Save the Children. (RT 54:9-26)

13 |     *D.A. Response To Date*: The defense has not been provided with a copy of any

14 | correspondence from the District Attorney to the Swedish Department of Save the Children.

15 |     4. *Order*: Send specifically worded letter to Danish police. (RT 56: 9-18)

16 |     *D.A. Response To Date*: The defense has not been provided with a copy of any

17 | correspondence from the District Attorney to the Danish police.

18 |     5. *Order*: Send specifically worded letter to Clovis police. (RT 62: 20-26)

19 |     *D.A. Response To Date*: The defense was provided with a copy of a letter to the

20 | Clovis police which was  filed with the Court as part of WHITMORE's April 1, 2004-filed

21 | motion to dismiss.  However, the defense has not received a copy of any subsequent letter

22 | to the Clovis police written along the lines suggested by the Court at the hearing on April

23 | 23, 2004. (RT 62: 20-26)

24 |     6. *Order*: Tape recorded statements of Eggert JENSEN and Lloyd EMMERSON. (rt

25 | 59: 13-24)

26 |     *D.A. Response To Date*: The defense has not been provided with Any tape recorded

27 | statements of Eggert JENSEN or Lloyd EMMERSON..

28 |

1    7. *Order*: Copy of French-language police report prepared by Swiss police

2  concerning statement by suspect Jean-Michel CATTIN. (RT 64:3-65:5)

3    *D.A. Response To Date*: The defense has not been provided with a copy of the report.

4    8. *Order*: All reports in connection with any evidence to be offered in the People's

5  case. (RT 63: 25-28)

6    *D.A. Response To Date*: The defense has been receiving reports from the District

7  Attorney since February, 2002. However, two things are clear: (a) evidence will be offered

8  in this case by the People which was obtained initially by the Danish police and the Swiss

9  police, (b) the defense has received virtually nothing of substance from the Danish police

10  and nothing whatsoever from the Swiss police.

11    At the hearing on April 23, 2004, the Court ordered a review of the District

12  Attorney's compliance with the Court's order two weeks hence, and set a date of May 6,

13  2004 at 4:00 p.m. for the hearing. (e.g. RT 44:3-5; 65: 6-7)

14  **V. Conclusion**

15    For the reasons stated here, WHITMORE respectfully requests that the Court (a) find

16  that the People are not in compliance with the Court's discovery orders and (b) dismiss the

17  charges against WHITMORE with prejudice.

18  Date: May 21, 2004                    Respectfully submitted,

19

20

21  GARY ROBERTS
    Counsel to Paul Gordon WHITMORE

22

23

24

25

26

27

28

E X H I B I T     Q

F 0·0 3 **E** 6 **D**
Clerk of the Superior Court

FEB 1 0 2005

By: ‿ ‿‿‿‿‿ Deputy

1  Gary Roberts  [SBN 87644]
   Attorney at Law
2  P.O. Box 620321
   San Diego, CA 92162
3  (619) 232-8366
   Fax and Voice Message (909) 752-7464
4
   Attorney for Defendant PAUL GORDON  WHITMORE
5

6            SUPERIOR COURT OF THE STATE OF CALIFORNIA

7              IN AND FOR THE COUNTY OF SAN DIEGO

8
   THE PEOPLE OF THE STATE OF                    No. SCD 165314
9  CALIFORNIA,                                   DA No. AAQ272

10                          Plaintiff,           NOTICE OF RENEWED MOTION
                                                 TO COMPEL DISCOVERY AND
11 v.                                            ORDER FOR SANCTIONS

12 PAUL GORDON WHITMORE,

13 and                                           Date: March 8-9, 2005
                                                 Time: 9:00 a.m.
14 BROOKE LOCKWOOD ROWLAND,                      Dept: 37

15                        Defendants.

16

17

18     NOTICE: On March 8-9, 2005 at 9: 00 a.m., in Department 37  of the above-

19 entitled court, at 220 West Broadway, in San Diego, California, defendant PAUL

   GORDON WHITMORE [hereinafter, "WHITMORE"], through his undersigned
20
   counsel, will renew his previously filed motions to compel discovery. Additionally,
21
   WHITMORE will move for an order to compel sanctions, including dismissal of this
22
   action with prejudice, or such other relief as is appropriate in the circumstances.
23
       The categories of discovery yet to be produced appear on pages 7-9 of the brief
24
   filed June 15, 2004 entitled, "Motion To Continue Hearing On Pre-Trial Motions And
25
   To Extend Deadlines To File Motions (Penal Code Section 1050)." The one exception to
26
   this list is that, since the last time this case was before the Court, the WHITMORE
27

28
   Renewed Motion To Compel Discovery and for Sanctions

1  defense has taken delivery of approximately 1,800 pages of discovery provided to the

2  District Attorney by the Danish police.

3  Previous discovery motions, including motions to compel discovery and for

4  sanctions, were filed in this Court on April, 1, 2004, and May 21, 2004, with

5  supplemental briefing filed on June 15, 2004. Predecessor motions filed prior to, and

6  during, the preliminary hearing, were filed on October 14, 2003, and December 22, 2003.

7  Previous discovery orders were made by the Court at hearings on November 4,

8  2003 (Hon. Howard Shore), December 23, 2003 (Hon. Bernard Revak), and April 23,

9  2004 (Hon. Laura Hammes).

10  WHITMORE incorporates here by this reference thereto the prior discovery

11  motions and prior discovery orders.

12  The instant motion is predicated on the failure of the People to comply in full with

13  existing discovery orders. The relief sought for this noncompliance is dismissal of the

14  action with prejudice, or such other relief as is appropriate in the circumstances.

15  **MEMORANDUM OF POINTS AND AUTHORITIES**

16  **I. New Request For Discovery**

17  **A. Request For Additional Danish Discovery**

18  Since the last time this case was before the Court, the WHITMORE defense has

19  taken delivery of approximately 1,800 pages of discovery provided to the District

20  Attorney by the Danish police.

21  A review of this discovery indicates the existence of at least two additional items

22  of discovery which the WHITMORE defense now requests from the prosecution.

23  First, reference is made on Danish discovery page 3045 to a log found in the

24  computer of Eggert Jensen concerning the editing of photographs of his daughter.

25  According to the discovery, there was a log showing when the pictures of Eggert

26  Jensen's daughter were edited. For only a few of the pictures was there direct camera

27  information concerning the date and time of the pictures. ("*Vedr. en del af disse serier*

28

Renewed Motion To Compel Discovery and for Sanctions

1  *forela der en log, visende, hvornar billederne var redigeret pa computeren. Kun i enkelte*
2  *serier forela der directe cameraplysninger, der viste data og klokkeslaet for*
3  *optagelserne.").*

4      This observation pertaining to an editing log refers, apparently, to the editing of
5  photographs of Jensen's daughter, rather than WHITMORE's daughter. However, the
6  mention of the editing log is of concern to the WHITMORE defense because digital
7  images seized from the Jensen computer are being used in this case against WHITMORE
8  as proof that WHITMORE sexually molested his daughter. It is common knowledge that
9  digital images of real persons and real events can be manipulated and edited to portray
10  real persons engaging in actions which did not occur.

11      The reference to a log showing when pictures were edited raises the possibility
12  that: (1) Eggert Jensen also edited, and thus also manipulated, and fictionalized, images
13  which were transmitted to him electronically by WHITMORE; and (2) on the basis of
14  these edited images, police and prosecutors believe, incorrectly, that WHITMORE
15  sexually molested his daughter. It is essential that the District Attorney request of the
16  Danish police additional information concerning the log to determine whether Eggert
17  Jensen edited pictures which were transmitted to him electronically by WHITMORE.

18      Second, reference is made on Danish discovery page 3090 to the fact that Danish
19  police interrogated Eggert Jensen concerning WHITMORE and to the fact that a report,
20  or possibly even a transcript of the interrogation, may exist in the form of a document
21  referred to on page 3090 as "G-25-9" ("*Afhoring af Eggert Jensen vedr. Paul*
22  *Whitmore*"). This report, or transcript, or whatever the document is, may indicate the *date*
23  of the interrogation and the *level of detail* of the information provided by Eggert Jensen.
24  It may indicate that police had all the information that they needed concerning
25  WHITMORE to obtain a search warrant for the WHITMORE residence at a date much
26  earlier in time than is conveyed in the affidavit for search warrant for the search warrant
27  which was served on the WHITMORE residence on January 27, 2002.

28

Renewed Motion To Compel Discovery and for Sanctions

1   This concern is substantiated by Danish discovery page 4146. There, a reference
2   is made to WHITMORE by his first and last name, and his street address in San Diego.
3   The document is dated "18 Dec. 2001." Also, Danish discovery pages 2806-2806
4   indicate that on November 21, 2001, in legal proceedings in Denmark, Eggert Jensen
5   discussed his knowledge of WHITMORE's purported sexual activities with
6   WHITMORE's daughter.

7   The concern that police knew of WHITMORE's whereabouts, address, and
8   activities at a date much earlier than is conveyed in the affidavit for search warrant for
9   the warrant served on the WHITMORE residence on January 27, 2002 is relevant to
10  WHITMORE's belief that the search warrant served on the WHITMORE residence was
11  stale, and, therefore, legally defective, and that all tangible and intangible evidence
12  obtained as a result of the search warrant must be suppressed. Please see the motion to
13  suppress evidence which is being filed contemporaneously with the instant discovery
14  motion.

15  Moreover, the instant request for "G-25-9" (see preceding page, concerning the
16  interrogation of Eggert Jensen as to his knowledge of WHITMORE) dovetails with an
17  order of this Court to produce discovery summarized on page 8, lines 9-12. of the June
18  15, 2004 filed brief entitled, "Motion To Continue Hearing On Pre-Trial Motions And
19  To Extend Deadlines To File Motions (Penal Code Section 1050)." There, reference is
20  made to "tape recorded statements of Eggert JENSEN and Lloyd EMMERSON."

21  **B. Request For A Copy Of Photograph Shown To Whitmore In 2002**

22  In the motion to suppress evidence being filed contemporaneously with the instant
23  discovery motion, WHITMORE claims that a photographic image was shown to him
24  when police came to his home on January 27, 2002 to serve the search warrant.
25  WHITMORE claims that police could not have obtained this photographic image from
26  the computer belonging to Eggert Jensen, because WHITMORE did not make it
27  available to Jensen. WHITMORE also claims that even if he made it available to Lloyd
28

Renewed Motion To Compel Discovery and for Sanctions

1  available to Jensen. WHITMORE also claims that even if he made it available to Lloyd
2  Emmerson, police could have not retrieved it from Emmerson's computer or computer
3  discs because police had searched Emmerson's residence just a day prior to executing the
4  search warrant on WHITMORE. There would not have been time for Clovis police to
5  examine Emmerson's computer and computer discs. Accordingly, WHITMORE
6  concludes that the Danish police or other persons unknown to WHITMORE unlawfully
7  entered his computer in order to retrieve the image.

8      The report of Det. Guerra concerning the search warrant served on the
9  WHITMORE residence on January 27, 2002 confirms that a photographic image was
10  shown to WHITMORE. (Discovery page 27.) For this reason, the WHITMORE defense
11  requests to be provided with the photographic image shown to WHITMORE on January
12  27, 2002, and the video from which it was captured.

13      **II. Discovery Which Has Been Previously Requested But Not Yet Produced**

14      With the exception of the approximately 1,800 pages of Danish discovery
15  mentioned above, the People have yet to comply with the discovery orders of this Court.
16  For a list the categories of discovery previously ordered to be produced, please see pages
17  7-9 of the brief filed June 15, 2004 entitled, "Motion To Continue Hearing On Pre-Trial
18  Motions And To Extend Deadlines To File Motions (Penal Code Section 1050)."

19      An example of the People's failure to comply with the Court's April 23, 2004
20  discovery order is their failure to produce the French-language Swiss police report
21  concerning Swiss suspect Jean-Michel Cattin. Reference to this report has been made
22  repeatedly throughout this case. It is referred to specifically on page 8 of the brief filed
23  June 15, 2004 entitled, "Motion To Continue Hearing On Pre-Trial Motions And To
24  Extend Deadlines To File Motions (Penal Code Section 1050)." WHITMORE has made
25  multiple requests for this report. (See May 21, 2004-filed "Status Of People's
26  Noncompliance With Discovery Orders [Etc.]" page 14, lines 1-3.)

27
28

Renewed Motion To Compel Discovery and for Sanctions

5

00321

1    The report is especially significant in view of a reference made to suspect Cattin
2    on Danish discovery page 3045. There, it was reported that Jean-Michel Cattin was
3    released from Swiss custody on March 22, 2002.  There was nothing further in the
4    Danish language discovery to indicate that Cattin was convicted of any crime or that he
5    ever went back into custody after March 22, 2002.

6    These facts suggest two possibilities: (1) that favorable treatment was accorded to
7    Cattin or (2) that Cattin was released from custody because of police misconduct in the
8    investigation of Cattin.

9    The question is: If favorable treatment was accorded Cattin, what did Cattin do for
10   the police to receive such treatment and how did Cattin's actions or cooperation if any
11   prejudice or impact on WHITMORE and the prosecution of the case against
12   WHITMORE? Alternatively, if police broke the law in connection with their
13   investigation of Cattin, does such misconduct if any infect the investigation and
14   prosecution of WHITMORE and provide WHITMORE with grounds presently unknown
15   to WHITMORE to move to suppress the evidence against him?

16   The Court might mistakenly assume that because of the passage of time, all
17   outstanding discovery issues between WHITMORE and the prosecution have been
18   resolved. Nothing could be further from the truth. With the exception of the receipt of the
19   approximately 1,800 pages of of Danish discovery mentioned above, the WHITMORE
20   defense is, for the most part,  no further along in its quest to obtain discovery from the
21   prosecution than it was when it last reported to the Court the status of discovery issues in
22   the brief filed June 15, 2004 entitled, "Motion To Continue Hearing On Pre-Trial
23   Motions And To Extend Deadlines To File Motions (Penal Code Section 1050)."

24

25

26

27

28

Renewed Motion To Compel Discovery and for Sanctions

### III. Conclusion

For the reasons stated here, the Court should ordered that the newly requested discovery be provided to the WHITMORE defense forthwith, and grant the relief sought by this motion, specifically, dismissal of the case with prejudice, or such other relief as is appropriate in the circumstances.

Date: February 10, 2005                    Respectfully submitted,


GARY ROBERTS
Counsel to Paul Gordon WHITMORE

E X H I B I T        R

BONNIE M. I
District Attorney
JEFFREY A. DORT
Deputy District Attorney, SBN 149295
LAURIE GUNN
Deputy District Attorney, SBN 165559
330 West Broadway
San Diego, CA 92101
(619) 531-4300

Attorneys for Plaintiff

**F** I **L** E **D**
Clerk of the Superior Court

SEP 3 0 2005

By: F. McCurley, Deputy

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF SAN DIEGO

| | |
|---|---|
| THE PEOPLE OF THE STATE OF CALIFORNIA, Plaintiff, | No. SCD174204 <br> DA. AAY144 <br><br> **OPPOSITION TO RELEASE OF VICTIM'S CONFIDENTIAL PSYCHOLOGICAL RECORDS** <br><br> Date: October 5, 2005 <br> Time: 9:00 <br> Dept: 40 |
| PAUL WHITMORE, and BROOKE ROWLAND | |
| Defendants. | |

Comes now the plaintiff, the People of the State of California, by and through their attorneys, BONNIE M. DUMANIS, District Attorney, and JEFFREY A. DORT, Deputy District Attorney, respectfully submits the following Points and Authorities in Opposition to Release of Victims' Confidential Psychological Records.

### POINTS AND AUTHORITIES

### I

### THE VICTIMS' PSYCHIATRIC RECORDS ARE CONFIDENTIAL

Defendant Whitmore has violated clear California law. What a victim says to his/her psychotherapist is privileged. To subpoena those records into court under the "guess" that there

may be an inconsistent statement or under the <u>Brady</u> line of cases is contrary to all published cases cited below.

**A. Evidence Code section 1014 provides:**

"Subject to *Section 912*, and except as otherwise provided in this article, the patient, whether or not a party, has a privilege to refuse to disclose, and to prevent another from disclosing, a confidential communication between patient and psychotherapist if the privilege is claimed by:

(a) The holder of the privilege.

(b) A person who is authorized to claim the privilege by the holder of the privilege.

(c) The person who was the psychotherapist at the time of the confidential communication, but the person may not claim the privilege if there is no holder of the privilege in existence or if he or she is otherwise instructed by a person authorized to permit disclosure"....

**B. Pursuant to Evidence Code section 1015** (When psychotherapist required to claim privilege), "the psychotherapist who received or made a communication subject to the privilege under this article shall claim the privilege whenever he is present when the communication is sought to be disclosed and is authorized to claim the privilege under subdivision (c) of *Section 1014*.

**C. Evidence Code section 1035.8** (Sexual assault victim-counselor privilege) states that "a victim of a sexual assault, whether or not a party, has a privilege to refuse to disclose, and to prevent another from disclosing a confidential communication between the victim and a sexual assault victim counselor if the privilege is claimed by:

(a) the holder of the privilege;

(b) A person who is authorized to claim the privilege by the holder of the privilege; or

(c) The person who was the sexual assault victim counselor at the time of the confidential communication but such person may not claim the privilege if there is no holder of the privilege in existence or if he is otherwise instructed by a person authorized to permit disclosure.

**D. Evidence Code section 1036.2** defines "Sexual Assault" as including the following conduct:

(f) A violation of Section 288 of the Penal Code,

Opposition to release of confidential psychological records.

2

00685

(i) Annoying or molesting a child under 18, as defined in Section 647a of the Penal Code,

(j) Any attempt to commit any of the above acts.


## II

## DEFENSE HAS SKIPPED THE FIRST STEP, AND HAS FAILED AT SETTING FORTH "GOOD CAUSE"

In this case the defendant seeks to review the victim's psychological records by stating the information may contain material inconsistent statements or other oral statements subject to *Brady v. Maryland* (1963) 373 US 83.

This approach is incorrect. The reason the psychotherapist-patient and sexual assault victim-counselor privileges exist is to better protect the patient and to allow people to seek the help they need to cope with the molest or sexual assault without worrying that what they say to their therapist will be revealed at some later time. In fact, the California Supreme Court agrees,

"For policy reasons, the psychotherapist-patient privilege is broadly construed in favor of the patient and exceptions to the privilege are narrowly construed." *People v. Strizinger* (1983) 34 Cal.3d 505, 511.

The proper procedure for disclosure of these records is a two-step process; first is the proper production of the records. Second is the review of the records *in camera* in the presence of the person authorized to claim the privilege... As set forth in *Lemelle v. Superior Court* (1978) 77 Cal.App.3d 148, 162, a defendant must first establish "good cause" and establish a "plausible justification" for producing such records.

In this case, the defense has not established *any* good cause or plausible justification for even having the records produced, let alone gaining access to the victim's privileged therapy records. They are merely on a "fishing expedition" to see if there might be anything of value in the records, but they have zero support for this belief. The victims in this has been consistent in her allegations against the defendant. Defense assumes because the victims in this case did not immediately report rape, sodomy, oral copulation and bondage, that there was no child abuse. A review of the evidence shows that the victims have never embellished or exaggerated the

Opposition to release of confidential psychological records.

fenses.  Under no circumstance should her records be produced or released without the court,

the very least, conducting an *in camera* review to determine what information, if any, should

: disclosed. To do otherwise, would violate the privacy rights of the victim.

Evidence Code section 1035.4 provides in part:

"The court may compel disclosure of information received by the sexual assault counselor which constitutes relevant evidence of the facts and circumstances involving an alleged sexual assault about which the victim is complaining and which is the subject of a criminal proceeding if the court determines that the probative value outweighs the effect on the victim, the treatment relationship, and the treatment services if disclosure is compelled. The court may also compel disclosure in proceedings related to child abuse if the court determines the probative value outweighs the effect on the victim, the treatment relationship and the treatment services if disclosure is compelled.

"When a court is ruling on a claim of privilege under this article, the court may require the person from whom disclosures is sought or the person authorized to claim the privilege, or both, to disclose the information in chambers out of the presence and hearing of all persons except the person authorized to claim the privilege and such other persons as the person authorized to claim the privilege is willing to have present. If the judge determines that the information is privileged and must not be disclosed, neither he or she nor any other person may ever disclose, without the consent of a person authorized to permit disclosure what was disclosed in the course of the proceedings in chambers......"

In *People v. Pack* (1988) 201 Cal.App.3d 679, 686, the court specifically stated **that this**

**:view of records to determine if there was "good cause" was in itself a "violation of**

**:ivacy" of the victim.**  (Emphasis added.)

III

THE COURT SHOULD CONDUCT IN CAMERA REVIEW<br>OF THE VICTIMS' CONFIDENTIAL RECORDS

The proper procedure for review of psychological records is set forth in *People v.*

*ammon* (1997) 15 Cal.4th 1117 and in Evidence Code section 1035.4.  In *Hamman*, the

alifornia Supreme Court reviewed the long standing policy that previously had been set forth

*i People v. Reber* (1986) 177 Cal.App.3d 523.  The Court criticized the process that was set

00687

forth by the *Reber* court and suggested that the trial court should conduct a review of records to determine whether the defendant's right to cross-examine overrides the victim's constitutional right of privacy.

This court should carefully review the victim's therapy records with a keen eye toward protecting her rights in this case. A dangerous precedent may be established by this court if the defense is able to make a vague claim of "*Brady* material" in a criminal action involving child molest in order to obtain the victims' confidential records and then use them against the children at trial.

The People hope that the court will reach the conclusion that this tactic of trying to gain access to, and using the therapy records of the victim without plausible justification, is inappropriate and will bar the defense from using this information in front of the jury in any way.

### CONCLUSION

Based upon the arguments above, the People respectfully request the court to deny the defendant's request for release of the victim's confidential psychological records.

If the Court decides that the defendant has made a 'good cause' showing for the disclosure of the confidential records, then the People respectfully request the Court to conduct an *in camera* review and balancing test to determine if the probative value of any relevant evidence outweighs the effect on the victim, the treatment relationship and the treatment services if such disclosure is compelled.

Respectfully submitted,

Dated: September 30, 2005

BONNIE M. DUMANIS
District Attorney

By: _____

JEFFREY A. DORT
Deputy District Attorney

Attorneys for Plaintiff

Opposition to release of confidential psychological records.

Oct 28, 2015
1 of 2

1    brief that was filed by the People of the State of California on
2    -- they filed something called Opposition to Release of Victims'
3    Confidential Psychological Records.  They filed it on September
4    the 30th.  They cannot represent these children.  They are not the
5    attorneys for the children.  The People of the State of California
6    also -- I mean, the District Attorney is not the attorney for the
7    children in this case.  The District Attorney is also not the
8    attorney for the psychotherapists.  And the **Bullen** case makes it
9    clear that it's a conflict of interest.
10            Not only that, but there's something slightly
11   intimidating about the brief they filed.  Page 1 says, "Defendant
12   Whitmore has violated clear California law."  That's a very
13   intimidating statement whenever it comes out of the mouth of a
14   prosecutor.  It's basically saying I've broken the law, as
15   Mr. Williams's -- as Mr. Whitmore's attorney, and that because
16   they have the power to file criminal charges, it's basically a
17   veiled threat to file some sort of criminal action against me for
18   doing my job as Mr. Whitmore's attorney.
19            And I think for them to do that amounts to
20   prosecutorial misconduct, to use their prosecutorial status,
21   basically, to threaten defense counsel with prosecution for having
22   issued a subpena to a witness.  That's, basically, what that line
23   at Page 1, Line 28 of their brief says to me.  It's a threat to
24   me.  And I -- I don't take that threat lightly.  It almost puts me
25   in a conflict of interest.
26            If they're going to threaten to prosecute me because
27   I'm defending Mr. Whitmore, I may have a duty to withdraw from
28   this case as Mr. Whitmore's counsel.  They set off a chain

1    reaction when they write things like this and file things like

2    this with the Court.  And I have a duty under the federal

3    constitution, the Sixth Amendment, to vigorously defend

4    Mr. Whitmore.  That's his right to counsel.  And they're basically

5    threatening to prosecute me because I'm doing my job under the

6    U.S. Constitution.

7        THE COURT:  Anything else, Mr. Roberts?

8        MR. ROBERTS:  I move to strike their brief.

9        THE COURT:  Mr. Dort, do you wish to be heard in this matter?

10       MR. DORT:  No.

11       THE COURT:  I will strike the People's brief in this case in

12   opposition to Mr. Whitmore's motion.

13       MR. DORT:  Well, I submitted as far as his comments, but I

14   don't want my --

15       THE COURT:  No.  That portion as it relates to this motion,

16   because you do not have standing on this issue.  Okay.

17       MR. DORT:  I may not have standing, but I think, as an

18   officer of the court, I have a duty to set forth the law to the

19   Court, and I think I correctly set forth the law that we can't

20   just jump past **Reber**.

21       THE COURT:  I'm going to just at this time strike that

22   portion of Mr. Dort's response, addressing this motion to compel

23   discovery by third-party witnesses, for lack of standing.

24           In this matter, Mr. Roberts, was there any other

25   information or any other evidence you wish to present?

26       MR. ROBERTS:  Well, I don't know the procedure, how the Court

27   wants to handle it.  I guess technically I'm calling Dr. Hillyard

28   to tender to Ms. McCurley -- to tender to the Court what I think

Dort| Roberts| Court
Oct 25, 2005

1    THE COURT:  Correct.

2        MR. DORT:  And it's -- I'm asking indulgence of the Court

3    to -- it can remain holding.  But what I need to do is -- there's

4    a variety of different areas that I need to go into.  Some are

5    foundational, some are authentication, and some go to the witness'

6    firsthand knowledge.

7        THE COURT:  I will take this matter under submission and I

8    will permit you to continue your examination of

9    Mr. Underbjorg -- or Detective Underbjerg.

10            Mr. Roberts, please raise the objection so that the

11   Court does not forget it.

12       MR. ROBERTS:  Okay.  And also I would object to the defendant

13   referring to my client as a monster [sic].  I've made a written

14   motion on that, and here the DA is just doing that in an open

15   courtroom, and I do object to that.

16       THE COURT:  Okay.  Let's just handle that one motion aside.

17            There is a defense motion to preclude or to refer to

18   the defendant in pejorative terms, more specifically "monster,"

19   "pervert" and "child molester."

20            Mr. Dort, do you wish to be heard?

21       MR. DORT:  I think the evidence proves that he is, and I will

22   refer to him what -- if the evidence shows that there is a

23   fingerprint on a window, I will call it a fingerprint on a window.

24   If it calls -- if a girl comes in and says, "He molested me," I

25   can call him a child molester.  I will not do it to the point

26   where it gets overburdensome.  But as the evidence comes in,

27   opening, cross, direct and especially closing, the law is

28   extremely clear that the DA can comment on the evidence,

1   specifically at closing.  I think closing is a different animal we

2   can deal with later.  But to call him a name, to call him what he

3   is I don't think is wrong.

4       THE COURT:  Mr. Roberts?

5       MR. ROBERTS:  Your Honor, that kind of language does not

6   comport with the dignity of the court, if nothing else.  And

7   secondarily, it's beneath the dignity of the office of the public

8   prosecutor to call the defendant a monster in open court.  And I

9   personally find it offensive, although that is not a legal

10  objection.

11      And this is -- this Court -- Mr. Dort, by using

12  language like that in open court, is trying to turn this

13  proceeding into a kangaroo court, which it's not, and it offends

14  the dignity of the court to use that kind of language.  It offends

15  you personally for a prosecutor to use that kind of language.  It

16  would be like using four-letter words in court.  That's -- we have

17  used some four-letter words, such -- because they are the names of

18  certain videos, but we certainly don't use four-letter words to

19  express our feelings.  And I don't think it's appropriate for the

20  District Attorney to use these pejorative terms to express his

21  feelings.  He needs to control his feelings when he is in a

22  public, legal forum.

23      THE COURT:  Okay.  At this time I will rule that the People

24  may not refer to the defendant in pejorative terms.  However, the

25  Court does not find the term "monster" or "child molester" to be

26  pejorative.  You may not use the term "pervert."

27      MR. DORT:  In any time of the trial, or specifically in

28  closing?

1   THE COURT:  Any time in the trial, not even closing.  You may

2   call him a monster.  You may call him a child molester, because he

3   is charged with child molesting.  And if you prove beyond a

4   reasonable doubt that he has molested children, then he is, in

5   fact, a child molester.  You may also use the term "monster,"

6   which the Court does not find to be pejorative.  So at this time

7   the only term that I am specifically precluding is calling him a

8   pervert.

9           Okay.  That having been said, the Court having now

10  ruled that Mr. Whitmore may not be referred to as pervert, but the

11  Court does not find the terms "monster" or "child molester" to be

12  pejorative terms, those may be used.

13          You may continue your examination of the detective.

14  BY MR. DORT:

15      Q.    Mr. Underbjerg, there was a point where the Judge and I

16  were off on a legal tangent in the sense of the California

17  Evidence Code that might have brought to your attention something

18  that you could have assisted in the conversation we were having

19  about the Evidence Code.

20          Was there something that you wanted to interject into

21  our conversation that might assist us?

22      MR. ROBERTS:  Objection.  Vague.  Ambiguous.

23      THE COURT:  Overruled.

24      THE WITNESS:  I would just like to explain how the procedure

25  is when we go out and assist the local police district.

26          The day that Eggert and his wife were arrested, we sent

27  an officer -- not me, another officer -- to the local police

28  district, because when you are arrested in Denmark, you have to

**E X H I B I T     S**

1   Gary Roberts [SE
    Attorney at Law
2   P.O. Box 620321
    San Diego, CA 92162
3   (619) 232-8366
    Fax and Voice Message (909) 752-7464
4
    Attorney for Defendant PAUL GORDON  WHITMORE
5

F   I   L   E   D
Clerk of the Superior Court

OCT 2 1 2005

By: F. McCurley, Deputy

6           SUPERIOR COURT OF THE STATE OF CALIFORNIA

7              IN AND FOR THE COUNTY OF SAN DIEGO

8

9   THE PEOPLE OF THE STATE OF           No. SCD 165314
    CALIFORNIA,                          DA No. AAQ272

10                      Plaintiff,       SUPPLEMENTAL
                                         MEMORANDUM OF POINTS
11  v.                                   AND AUTHORITIES IN SUPPORT
                                         OF MOTION TO SUPPRESS
12  PAUL GORDON WHITMORE,                EVIDENCE -- ROUND TWO --
                                         AND MOTION #4 TO COMPEL
13  and                                  DISCOVERY (FTP LOGS
                                         RELEVANT TO PC 1538.5
14  BROOKE LOCKWOOD ROWLAND,             MOTION) OR TO DISMISS THIS
                                         ACTION
15                      Defendants.
                                         Date: October 24, 2005
16  ───────────────────────────────      Time: 10:30 a.m.
                                         Dept: 40
17

18  **I. Introduction.**

19        On September 23, 2005, defendant PAUL GORDON WHITMORE [hereinafter,

20  "WHITMORE"], through his undersigned counsel, filed a motion with this Court entitled

21  "Notice Of Motion And Motion Of Defendant Whitmore To Suppress Evidence - Round

22  Two (Penal Code Section 1538.5)."

23        On September 30, 2005, WHITMORE, through his undersigned counsel, filed a

24  related motion with this Court entitled "Notice of Motion And Motion Of Defendant

25  Whitmore To Continue Hearing On Motion To Suppress Evidence And Motion #4 To

26  Compel Discovery (FTP Logs Relevant To PC 1538.5 Motion) Or To Dismiss This

27  Action."

28

Supplemental Briefing re Motion To Suppress Evidence And To Compel Discovery Or Dismiss - Defendant Whitmore

The pending suppression motion is predicated on the following theory: The Danish police unlawfully hacked WHITMORE's computer and unlawfully seized the oral copulation videos. The Danish police thereafter told U.S. Customs as well as to San Diego County Sheriff's Detective Stephanie Guerra that they found the oral copulation videos on Eggert Jensen's computer. Thus, Det. Guerra inferred that WHITMORE sent the images to Eggert Jensen sometime between November 1- 14, 2001. For purposes of the suppression motion, the term "hacked" means surreptitious electronic entry into a computer without the knowledge of or consent of the owner of the computer, or without a warrant, court order, or other legal process to permit surreptitious electronic entry to the computer.

The pending suppression motion is further premised on the fact that Eggert Jensen was arrested, and his computer seized, by Danish police on or about November 16, 2001. Furthermore, WHITMORE will testify at the hearing on the pending motion that he did not create the oral copulation videos until Thanksgiving, 2001, that he never sent the oral copulation videos to Eggert Jensen, and that, even if he sent the oral copulation videos to other individuals, he did so only after he created the videos, and certainly not prior to the arrest of Eggert Jensen, or the seizure of Eggert Jensen's computer by Danish police on or about November 16, 2001.

The pending suppression motion is further premised on these facts: The defense has been requesting FTP logs from the prosecution since September, 2002. The FTP logs which the prosecution provided to the defense last week[1] do not show that Eggert Jensen electronically received video images from anyone with whom Jensen was trading child pornography, including Paul Whitmore, Lloyd Emmerson (Clovis, California), Jean-

---

[1] Last week in court, on October 12, 2005, DA Jeff Dort handed the undersigned computer discs labeled Denmark II, III, and IV. Also, last week, on October 13, 2005, the District Attorney's Office provided the undersigned with discovery pages 6063-6200.

1    Michel Cattin (Switzerland), and others.

2          The obvious question, which the prosecution has failed to answer in the three and

3    a half plus years that this case has been pending in the Superior Court, is how and when

4    did Eggert Jensen receive these oral copulation videos from Paul Whitmore? The defense

5    is informed that Eggert Jensen has been cooperating with the Danish police since the day

6    of his arrest in November, 2001, and that the Danish police performed a forensic

7    examination of Eggert Jensen's computer. Yet, in all this time, the prosecution has failed

8    to provide the defense with any discovery which answers these basic questions relating to

9    the oral copulation videos. The silence has been deafening.

10          Presumably, the Danish police (i.e. Lars Underbjerg) will testify this coming

11    week. Presumably, the prosecution has adhered to its duty to provide the defense with

12    statements of its witnesses. (Penal Code section 1054.) Thus the question, where is the

13    discovery which shows that WHITMORE transmitted the oral copulation videos to

14    Eggert Jensen? The prosecution has never produced it. The defense has never seen it.

15          With all due deference to the notion of "truth, justice, and the American way,"[2] the

16    defense submits that "there is something rotten in Denmark."[3] The defense respectfully

17    submits that the reason the prosecution has not provided the defense with proof that

18    WHITMORE transmitted the oral copulation videos to Eggert Jensen is that none exits.

19    Instead, the Danish police have cleverly pulled the wool over the eyes of U.S. Customs,

20

21

22          [2]From the 1950's television series "Superman," starring George Reeves (not to be confused
      with Christopher Reeve (no "s") who played Superman in the film version), also the title of a

23    forthcoming motion picture ("Truth Justice and the American Way") starring Ben Affleck as George
      Reeves.

24

25          [3]"Something is rotten in the state of Denmark." Line spoken by Marcellus, from the play,
      "Hamlet," Act I, Scene IV, by William Shakespeare; not to be confused with "Operation Hamlet,"

26    an investigation of WHITMORE by U.S. Customs, in which WHITMORE and others were indicted
      in the U.S. District Court for the Eastern District of California.

27

28

Supplemental Briefing re Motion To Suppress Evidence And To Compel Discovery Or Dismiss - Defendant Whitmore
                                                                                                          3

1   the San Diego Sheriff's Department, and the San Diego Police Department into believing

2   that the Danish police are on the up and up and that WHITMORE sent the oral

3   copulation videos to Eggert Jensen.

4       The computer equipment allegedly seized by Danish police from Eggert Jensen --

5   although ostensibly examined by Danish police -- has never been examined by anyone

6   else, certainly not by U.S. Customs, and certainly not by the R.C.F.L. -- the San Diego

7   regional computer forensic laboratory which examines computers for local law

8   enforcement. Instead, U.S. authorities have simply taken the Danes at their word that

9   WHITMORE sent the oral copulation videos to Eggert Jensen and that the Danes found

10  the videos on Eggert Jensen's computer.

11      For these reasons, on September 30, 2005, WHITMORE, through his undersigned

12  counsel, filed the motion entitled "Notice of Motion And Motion Of Defendant

13  Whitmore To Continue Hearing On Motion To Suppress Evidence And Motion #4 To

14  Compel Discovery (FTP Logs Relevant To PC 1538.5 Motion) Or To Dismiss This

15  Action."

16      The purpose of the September 30, 2005 filed motion – aside from obtaining a

17  continuance of the hearing on the pending suppression motion – was to compel the

18  prosecution to put up or shut on the issue of whether WHITMORE sent the oral

19  copulation videos to the Eggert Jensen. If such discovery exists, produce it.[4] If such

20

21      [4]The prosecution not only can, but should, provide the defense with the discovery. To date,
22  the prosecution has provided the defense with approximately a thousand pages of Danish police
23  discovery, as well as four or more computer discs. The prosecution's duty to provide the defense
    with such discovery is set forth in *Kyles v. Whitley* (1995) 514 U.S. 419, 437 and *In re Littlefield*
24  (1993) 5 Cal. 4th 122, 135. Under *Kyles v. Whitley*, a prosecutor "has a duty to learn of any favorable
    evidence known to the others acting on the government's behalf in [this] case, including the police."
25  (*Kyles v. Whitley* (1995) 514 U.S. 419, 437.) Under *In re Littlefield*, the standard in determining
26  whether the prosecution must produce the discovery is whether it is "reasonably accessible" to the
    prosecution. (*In re Littlefield* (1993) 5 Cal. 4th 122, 135.)

27

28

1  discovery does not exist, admit it does not exist. In all likelihood, the Danish police lied

2  when they said that WHITMORE sent the oral copulation videos to Eggert Jensen.

3      On December 23, 2003, Judge Revak, after six days of preliminary hearing

4  testimony in this case, issued a discovery order which broadly defined the prosecution's

5  *Brady* obligation to include material in the possession of the Danish police. Judge Revak

6  made a factual finding that "the agencies that were involved in this investigation are all

7  part of the team." (Transcript, hearing on December 23, 2003 before the Hon. Bernard

8  Revak, Vol. 6 of the preliminary hearing transcript, page 855, lines 4-5.) Judge Revak

9  further stated, ". . . anything out of Denmark that you can obtain relative to that

10  investigation, Switzerland, U.S. Customs, I think they're all part of the investigation

11  team. And wasn't there something in South Carolina?" (*Id.*, pages 859, starting line 24,

12  to 860 (line 1).)

13      Judge Revak continued, "I think the District Attorney is obliged to seek out any

14  type of information that may be exculpatory to these defendants, and that would include

15  against Clovis, United States Attorney's Office out of Fresno, the Danish authorities, the

16  Swiss authorities, to make inquiry and request from them any and all reports relative to

17  this investigation." (*Id.*, page 855, lines 17-23)

18      At a hearing on April 23, 2004, before the Hon. Laura Hammes, Judge Hammes

19  embraced, and broadened Judge Revak's discovery order. Judge Hammes said, "Okay.

20  And posthaste on getting to Denmark to get the reports . . . (Transcript of hearing on

21  April 23, 2004 before the Hon. Laura Hammes, page 43, lines 20-21[5].)

22      Directing her comments to Deputy District Attorney Jeffrey Dort, and his letter to

23  various police agencies to request discovery connected to this case, Judge Hammes

24  continued, "I would even go broader than that, and I would say that you want every

25  

26      [5]The transcript of the April 23, 2004 hearing prepared by court reporter Traci Foster inadvertently titled the transcript, "995 Motion."

27  

28  

Supplemental Briefing re Motion To Suppress Evidence And To Compel Discovery Or Dismiss - Defendant Whitmore

5

1 single report connected to Jensen whether it originated in Sweden or wherever, every

2 affidavit, every search warrant, every arrest warrant, every report they have connected to

3 the Jensen investigation because it's all going to tie in to how they got that stuff." (*Id.*,

4 page 56, lines 9-15.)

5        At a recent hearing before this Court on October 5, 2005, this Court questioned

6 the legal (as well as factual) soundness of the pending suppression motion - round two.

7 The Court requested that the parties brief the issue: Whether the Fourth Amendment

8 applies to searches conducted in this country by foreign police officers. More

9 specifically, the Court asked – assuming that the defense can show that the Danish

10 police hacked WHITMORE's computer – whether the Fourth Amendment applies to an

11 unlawful hacking of a computer located on American soil by the Danish police where the

12 defense <u>cannot</u> show that the Danish police acted with the prior knowledge, acquiescence

13 or approval of American, U.S. government, or state law enforcement authorities.

14        Moreover, this Court questioned the prosecution's duty to provide  the defense

15 with any potential exculpatory or *Brady* material in the possession of the Danish police.

16 This Court expressed the view that the Danish police are not part of the "prosecution

17 team."

18        With all due respect, this Court's position on this issue worries the defense for

19 three reasons: First, the Court's position appears to differ substantially from the rulings

20 by Judges Revak and Hammes, who broadly interpreted the prosecution's *Brady*

21 obligations to *include* "anything out of Denmark" (Judge Revak, quoted above)  and

22 "every single report connected to Jensen whether it originated in Sweden or wherever"

23 (Judge Hammes, quoted above). Second, the defense respectfully submits that the rulings

24 of Judges Revak and Hammes constitute the "rule of the case" and cannot now be

25 changed this close to trial.  To change the rule would work a substantial unfairness to the

26 defense, and deny WHITMORE due process of law. Third, to date, the prosecution has

27

28

Supplemental Briefing re Motion To Suppress Evidence And To Compel Discovery  Or Dismiss - Defendant Whitmore

6

1   provided the defense with approximately a thousand pages of Danish police discovery, as

2   well as four or more computer discs. These facts establish that any *Brady* or exculpatory

3   discovery which is in the possession of the Danish police *is* "reasonably accessible" to

4   the prosecution.

5        For these reasons, the defense respectfully requests that this Court fully enforce

6   the prosecution's *Brady* obligations as well as the prosecution's obligation under Penal

7   Code section 1054.1(e) to produce "exculpatory" material.

8   **II. The Fourth Amendment "Exclusionary Rule" Applies To Any Unlawful Search**
    **Of WHITMORE's Computer By The Danish Police.**

9        The question here is whether the Fourth Amendment "exclusionary rule" applies

10  to an unlawful search of a computer located on *American soil* by Danish police. The

11  defense believes that WHITMORE's computer, although located on American soil, was

12  electronically hacked by Danish police who were located in Denmark. The unlawfully

13  seized evidence was later turned over to American law enforcement authorities, who

14  utilized the unlawfully seized evidence to obtain a search warrant to conduct a

15  presumptively lawful search of WHITMORE's residence. The residence was located on

16  American soil. WHITMORE is unable to show that the Danish police, in hacking his

17  computer, acted with the consent, knowledge or acquiescence of American law

18  enforcement, or that American law enforcement authorities later learned of the unlawful

19  means by which the evidence was obtained.

20       The Fourth Amendment "exclusionary rule" *does* apply to the search.  First, the

21  Danish police were not acting as "private parties." Their search was not shielded from

22  the "exclusionary rule" by the holding in *Burdeau v. McDowell* (1921) 260 U.S. 465. In

23  *Burdeau*, the U.S. Supreme Court held that the Fourth Amendment's "exclusionary rule"

24  does not apply to private searches. Clearly, the Danish police did not conduct a *private*

25  *search*. They were police, acting as police, conducting a police investigation as an arm of

26

27

28

Supplemental Briefing re Motion To Suppress Evidence And To Compel Discovery Or Dismiss - Defendant Whitmore
7

1   Danish government.

2        Nor was the search shielded from the "exclusionary rule" by the "silver platter"

3   doctrine. In *Elkins v. United States* (1960) 364 U.S. 206, the U.S. Supreme Court

4   repudiated the "silver platter" doctrine, under which it "was previously permissible for

5   federal courts to receive into evidence items which were obtained in a state search by

6   means which, if engaged in by federal officers, would constitute a violation of the Fourth

7   Amendment." (Vol. 1, Wayne LaFave, Search and Seizure, section 1.5(c), page 175, 4[th]

8   ed, hereinafter cited as "LaFave, section ___, page ___.")

9        Nor was the search shielded from the "exclusionary rule" by the "international

10   silver platter" doctrine, under which searches conducted on *foreign soil* by foreign police

11   are exempt from the Fourth Amendment. (LaFave, section 1.8(h), page 322.) The issue

12   here involves an unlawful search by Danish police on *American soil*

13        In assessing the current state of the "silver platter" doctrine, LaFave concludes,

14   "there does not currently appear to be any dispute that evidence obtained in violation of

15   the Constitution must be suppressed: (i) when the search was by state officers and the

16   evidence is offered in a federal prosecution; (ii) when the search was by federal officers

17   and the evidence is offered in a state prosecution; and (iii) when the search was by

18   officers in one state and the evidence is offered in a prosecution in another state."

19   (LaFave, section 1.5(c), page 175.)

20        The defense submits that Denmark, for Fourth Amendment purposes, is a "state."

21   When its police officers conduct an unlawful search on *American soil*, the evidence so

22   seized is subject to the "exclusionary rule" if later used by U.S. authorities to bring a

23   criminal prosecution within the United States.

24        Alternatively, a search by Danish police on American soil constitutes "state

25   action" and is subject to the Fourth Amendment "exclusionary rule" under the holding in

26   *New Jersey v. T.L.O.* (1985) 469 U.S. 325. There, the U.S. Supreme Court extended the

27

28

1 Fourth Amendment "exclusionary rule" to an unlawful search of a student conducted by

2 a school official.

3      Finally, public policy prohibits THE PEOPLE from using evidence which is

4 unlawfully seized by Danish police from American soil when those police later become

5 part of the "prosecution team" by turning over approximately a thousand pages of

6 discovery and four or more computer discs, and by traveling from Denmark to testify for

7 the prosecution.

8 **III. At The Hearing To Be Conducted On October 24, 2005, This Court Should Permit WHITMORE To Call The Danish Police (Lars Underbjerg And Others) As Hostile Witnesses To Establish Whether Said Witnesses Carried Out A Warrantless Electronic Search Of WHITMORE's Computer, Whether They Obtained The Oral Copulation Videos By Means Of Such Search, Or To Otherwise Establish How Said Witnesses Came Into Possession Of Said Videos.**

9

10

11

12      As noted in prior briefing filed with this Court, at the hearing to be conducted on

13 October 24, 2005, WHITMORE has the burden to establish that the Danish police

14 carried out a warrantless electronic search of his computer and that the oral copulation

15 videos were obtained as a result of said search(es). Accordingly, WHITMORE should be

16 permitted to call the Danes as hostile witnesses to establish these threshold facts.

17      If said witnesses deny having carried out such a warrantless electronic search,

18 WHITMORE should be permitted to inquire of said witness(es) how they came into

19 possession of the oral copulation videos.

20 **IV. This Court Must Follow The View That Material Which Is In The Possession Of The Danish Police Is "Reasonably Accessible" To The Prosecution And Order Its Production To The Defense.**

21

22      As noted in footnote 4, *supra*, the prosecution not only can, but should, provide

23 the defense with further discovery from the Danish police. To date, the prosecution has

24 provided the defense with approximately a thousand pages of Danish police discovery, as

25 well as four or more computer discs. The prosecution's duty to provide the defense with

26 such discovery is set forth in *Kyles v. Whitley* (1995) 514 U.S. 419, 437 and *In re*

27

28

Supplemental Briefing re Motion To Suppress Evidence And To Compel Discovery Or Dismiss - Defendant Whitmore

9

1   *Littlefield* (1993) 5 Cal. 4th 122, 135. Under *Kyles v. Whitley*, a prosecutor "has a duty to

2   learn of any favorable evidence known to the others acting on the government's behalf in

3   [this] case, including the police." (*Kyles v. Whitley* (1995) 514 U.S. 419, 437.) Under *In*

4   *re Littlefield,* the standard in determining whether the prosecution must produce the

5   discovery is whether it is "reasonably accessible" to the prosecution. (*In re Littlefield*

6   (1993) 5 Cal. 4th 122, 135.)

7   Date: October 21, 2005                      Respectfully submitted,

8                                               GARY ROBERTS

9

10                                              GARY ROBERTS
                                                Counsel to Paul Gordon WHITMORE

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

E X H I B I T          T



**THE STATE BAR
OF CALIFORNIA**

OFFICE OF THE CHIEF TRIAL COUNSEL
AUDIT & REVIEW

1149 SOUTH HILL STREET, LOS ANGELES, CALIFORNIA 90015-2299

TELEPHONE: (213) 765-1612
TDD: (213) 765-1566
FAX: (213) 765-1442
http://www.calbar.ca.gov

April 18, 2007

Paul Whitmore
#T198648, Fresno County Jail
P.O. Box 872
Fresno, CA 93712

RE:          Respondent:   Jeffrey Dort/Elizabeth Kuchta
             Case No.:     06-28614

Dear Mr. Whitmore:

Your complaint and all supplemental documents and/or information you provided in your January 18, 2007 letter have been reexamined as part of the internal review process of the Office of the Chief Trial Counsel. After carefully analyzing the facts, the law, the high standard of proof in State Bar matters, and the likelihood of successful prosecution, it has been determined that your matter will remain closed.

Your complaint against Mr. Dort alleged that he acted inappropriately as the prosecuting attorney in your criminal case by calling you offensive names. Please be advised that although this action is not to be condoned, there is no Rule of Professional Conduct or Business and Professions Code section that was violated. You also complained that Ms. Kuchta was incompetent in representing your son's interests and potentially exposed him to serious charges. If you believe Ms. Kuchta was so negligent as to constitute legal malpractice, you should consult legal counsel to determine if you or your son have any civil recourse against her.

In order to seek review of this decision, you must file a verified accusation against the attorney with the California Supreme Court, pursuant to rule 9.13, subsection (d) through (f), California Rules of Court, within **60** days of the date of this letter.

The Clerk of the Supreme Court has instructed us to advise you that no specific form is used by the Supreme Court for the filing of a verified accusation against an attorney. You may obtain specific information by contacting the Clerk's office in Los Angeles or in San Francisco. The addresses and phone numbers of the respective offices are listed below.

California Supreme Court
Clerk's Office
300 South Spring Street
Second Floor, Room 2752
Los Angeles, CA 90013
(213) 830-7570

California Supreme Court
Clerk's Office
350 McAllister Street
San Francisco, CA 94102
(415) 865-7000

SB1-#78437-v2-Dort_Kuchta_-_06-28614.DOC

Paul Whitmore
April 18, 2007
Page 2

Please be aware that if you file a verified accusation against the attorney, the Office of the Chief Trial Counsel will only reopen its file in this matter if the California Supreme Court issues an order granting your request.

You may also wish to consult with legal counsel for advice regarding any other civil, criminal, or administrative remedies which may be available to you.  You may contact your local or county bar association to obtain the names of attorneys who might assist you further in this matter.


Very truly yours,


OFFICE OF THE CHIEF TRIAL COUNSEL/AUDIT AND REVIEW
N09

JS 44 (Rev. 12/12)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

| | |
|---|---|
| **I. (a) PLAINTIFFS**<br>Paul Gordon Whitmore<br>G-40654 | **DEFENDANTS**<br>Jeffrey Dort, et al. |
| **(b)** County of Residence of First Listed Plaintiff   Kings<br>*(EXCEPT IN U.S. PLAINTIFF CASES)* | County of Residence of First Listed Defendant<br>*(IN U.S. PLAINTIFF CASES ONLY)*<br>NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF<br>THE TRACT OF LAND INVOLVED. |
| **(c)** Attorneys *(Firm Name, Address, and Telephone Number)*<br>Paul Gordon Whitmore<br>PO Box 3471<br>Corcoran CA 93212-3471 | Attorneys *(If Known)*<br><br>14 cv 2949 DMS BGS |

**II. BASIS OF JURISDICTION** *(Place an "X" in One Box Only)*

- ☐ 1 U.S. Government Plaintiff
- ☒ 3 Federal Question (U.S. Government Not a Party)
- ☐ 2 U.S. Government Defendant
- ☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** *(Place an "X" in One Box for Plaintiff and One Box for Defendant)* (For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. NATURE OF SUIT** *(Place an "X" in One Box Only)*

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment & Enforcement of Judgment<br>☐ 151 Medicare Act<br>☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans)<br>☐ 153 Recovery of Overpayment of Veteran's Benefits<br>☐ 160 Stockholders' Suits<br>☐ 190 Other Contract<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | **PERSONAL INJURY**<br>☐ 310 Airplane<br>☐ 315 Airplane Product Liability<br>☐ 320 Assault, Libel & Slander<br>☐ 330 Federal Employers' Liability<br>☐ 340 Marine<br>☐ 345 Marine Product Liability<br>☐ 350 Motor Vehicle<br>☐ 355 Motor Vehicle Product Liability<br>☐ 360 Other Personal Injury<br>☐ 362 Personal Injury - Medical Malpractice | **PERSONAL INJURY**<br>☐ 365 Personal Injury - Product Liability<br>☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability<br>☐ 368 Asbestos Personal Injury Product Liability<br>**PERSONAL PROPERTY**<br>☐ 370 Other Fraud<br>☐ 371 Truth in Lending<br>☐ 380 Other Personal Property Damage<br>☐ 385 Property Damage Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881<br>☐ 690 Other | ☐ 422 Appeal 28 USC 158<br>☐ 423 Withdrawal 28 USC 157<br>**PROPERTY RIGHTS**<br>☐ 820 Copyrights<br>☐ 830 Patent<br>☐ 840 Trademark<br>**SOCIAL SECURITY**<br>☐ 861 HIA (1395ff)<br>☐ 862 Black Lung (923)<br>☐ 863 DIWC/DIWW (405(g))<br>☐ 864 SSID Title XVI<br>☐ 865 RSI (405(g)) | ☐ 375 False Claims Act<br>☐ 400 State Reapportionment<br>☐ 410 Antitrust<br>☐ 430 Banks and Banking<br>☐ 450 Commerce<br>☐ 460 Deportation<br>☐ 470 Racketeer Influenced and Corrupt Organizations<br>☐ 480 Consumer Credit<br>☐ 490 Cable/Sat TV<br>☐ 850 Securities/Commodities/ Exchange<br>☐ 890 Other Statutory Actions<br>☐ 891 Agricultural Acts<br>☐ 893 Environmental Matters<br>☐ 895 Freedom of Information Act<br>☐ 896 Arbitration<br>☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision<br>☐ 950 Constitutionality of State Statutes |
| **REAL PROPERTY**<br>☐ 210 Land Condemnation<br>☐ 220 Foreclosure<br>☐ 230 Rent Lease & Ejectment<br>☐ 240 Torts to Land<br>☐ 245 Tort Product Liability<br>☐ 290 All Other Real Property | **CIVIL RIGHTS**<br>☐ 440 Other Civil Rights<br>☐ 441 Voting<br>☐ 442 Employment<br>☐ 443 Housing/ Accommodations<br>☐ 445 Amer. w/Disabilities - Employment<br>☐ 446 Amer. w/Disabilities - Other<br>☐ 448 Education | **PRISONER PETITIONS**<br>**Habeas Corpus:**<br>☐ 463 Alien Detainee<br>☐ 510 Motions to Vacate Sentence<br>☐ 530 General<br>☐ 535 Death Penalty<br>**Other:**<br>☐ 540 Mandamus & Other<br>☒ 550 Civil Rights<br>☐ 555 Prison Condition<br>☐ 560 Civil Detainee - Conditions of Confinement | **LABOR**<br>☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Management Relations<br>☐ 740 Railway Labor Act<br>☐ 751 Family and Medical Leave Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Employee Retirement Income Security Act<br><br>**IMMIGRATION**<br>☐ 462 Naturalization Application<br>☐ 465 Other Immigration Actions | **FEDERAL TAX SUITS**<br>☐ 870 Taxes (U.S. Plaintiff or Defendant)<br>☐ 871 IRS—Third Party 26 USC 7609 | |

**V. ORIGIN** *(Place an "X" in One Box Only)*

- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from Another District *(specify)*
- ☐ 6 Multidistrict Litigation

**VI. CAUSE OF ACTION**

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
42:1983
Brief description of cause:
Prisoner Civil Rights

**VII. REQUESTED IN COMPLAINT:**

☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND: ☐ Yes ☐ No

**VIII. RELATED CASE(S) IF ANY** *(See instructions):*

JUDGE _____ DOCKET NUMBER _____

DATE
12/12/2014

SIGNATURE OF ATTORNEY OF RECORD
s/SKHoestenbach

**FOR OFFICE USE ONLY**

RECEIPT # _____ AMOUNT _____ APPLYING IFP _____ JUDGE _____ MAG. JUDGE _____

CORCORAN
STATE PRISON

U.S POSTAGE>>PITNEY BOWES

ZIP 93212 $ 036.750
02 1N
0001385340 DEC 10 2014

Priority Mail
CommBaServce

LEGAL MAIL

Clerk of the Court
US District Court - SoCal
ES Schwartz Courthouse
221 West Broadway
San Diego, CA 9201

Daniel Whitmore G40654
CSP-Corcoran
3c3 220L
P-Box 347/
Corcoran, CA 9 3212-3447

LEGAL MAIL

LEGAL MAIL



Carmelo 12-9-14

RECEIVED
SUPERIOR COURT OF CALIFORNIA
SAN DIEGO CENTRAL COURT

DEC 1 1 2014